## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BALTIMORE AIRCOIL COMPANY, INC.    :
    :
    :
    v.    :    Civil No. CCB-13-2053
    :
    :
SPX COOLING TECHNOLOGIES, INC. *et al.* :

## MEMORANDUM

Baltimore Aircoil Company, Inc. ("BAC") filed this lawsuit against SPX Cooling

Technologies, Inc., Sanderson Farms, Inc., and Eagle Mountain International Church Inc.

(collectively, "SPX"), asserting infringement of U.S. Patent No. 7,107,782 ("'782 patent") and

U.S. Patent No. 6,820,685 ("'685 patent"), both of which relate to heat exchanger technology

used in industrial-sized air conditioners.  The parties sought claim construction for several

disputed claim terms, (*see* Am. Joint Claim Construction Statement ("JCC") 3-10, ECF No. 89),

and filed three sets of briefs.[1]  On May 28, 2015, the court held a *Markman* hearing and

technology tutorial.  The court now construes the disputed terms.

## ANALYSIS

Patent claims are construed as a matter of law.  *See Markman v. Westview Instruments,*

*Inc.*, 517 U.S. 370, 372 (1996).  "[T]he words of a claim are generally given their ordinary and

customary meaning[,]" which is "the meaning that the term would have to a person of ordinary

---

[1] Although the scheduling order called for only opening and responsive briefs, on May 26, 2015, SPX filed a third, "supplemental" brief (ECF No. 97) addressing the declaration of Mr. Welch, which BAC disclosed for the first time in its response brief.  BAC moved to strike this brief (ECF No. 98), arguing it was untimely and made new arguments.  BAC then moved for leave to file its own supplemental brief (ECF No. 102) in response to SPX's.
  The court will deny BAC's motion to strike and grant its motion for leave to file a supplemental brief.  SPX had no chance to respond to Mr. Welch's declaration, so the court will consider SPX's supplemental brief.  BAC argues SPX's brief makes new arguments, but it makes only variations of SPX's indefiniteness arguments, which were amply disclosed in the amended joint claim construction statement.  (*See, e.g.*, JCC 18-19 ("Dr. Dorgan may testify . . . that a person of ordinary skill in the art would not be able to determine the scope of the claim limitation "effective diameter D" with reasonable certainty based on the disclosure of the '685 patent.").)  That the court will also consider BAC's supplemental brief offsets BAC's concern that it will suffer undue prejudice.

skill in the art in question at the time of the invention . . . ."  *Phillips v. AWH Corp.*, 415 F.3d

1303, 1312-13 (Fed. Cir. 2005) (en banc) (citations and quotation marks omitted).  "A claim

construction that gives meaning to all the terms of the claim is preferred over one that does not

do so."  *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005); *see

also Pfizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1364, 1373 (Fed. Cir. 2005) (suggesting

that the court should construe claims so the patent is "internally consistent").

To determine the ordinary and customary meaning of terms, the court looks first to

intrinsic evidence[2] and then, in its discretion, to extrinsic evidence.[3]  In considering the intrinsic

evidence, "[t]he appropriate starting point . . . is always with the language of the asserted claim

itself."  *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1464 (Fed. Cir. 1998).  Then, the

court turns to the specification, which is "the single best guide to the meaning of a disputed

term"; indeed, it is usually dispositive.  *Phillips*, 415 F.3d at 1315.

After considering the claims and the specification, the court may look to the prosecution

history "to determine whether it contains statements that narrow the scope of the claims."

*Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006) (citation

omitted).  For prosecution disclaimer to apply, "the alleged disavowing actions or statements"

must be "both clear and unmistakable."  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314,

1325-26 (Fed. Cir. 2003).  Such a disclaimer exists, for example, when a patentee "explicitly

characterizes an aspect of his invention in a specific manner to overcome prior art[,]" *Purdue

Pharma*, 438 F.3d at 1136 (citations omitted), or when a statement is "definitional[,]" *Vasudevan

Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 679 (Fed. Cir. 2015) (concluding that the

---

[2] Intrinsic evidence refers to "the patent itself, including the claims, the specification and, if in evidence, the prosecution history."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).
[3] Extrinsic evidence refers to "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."  *Markman*, 52 F.3d at 980.

applicant's use of the phrase 'refers to' "indicate[d] an intention to define a term" that precluded a different definition during claim construction).  But prosecution disclaimer "does not apply to an ambiguous disavowal." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008).  The court considers the "totality of the prosecution history," not just statements viewed in isolation.  *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1326 (Fed. Cir. 2002); *see also Uship Intellectual Properties, LLC v. United States*, 714 F.3d 1311, 1315 (Fed. Cir. 2013).

When analysis of the intrinsic evidence alone does not resolve the ambiguities in a disputed claim term, the court may in its discretion turn to extrinsic evidence.  *See Vitronics Corp.*, 90 F.3d at 1583 (reasoning that it is improper to rely on extrinsic evidence when an examination of the intrinsic evidence resolves the ambiguities in a disputed claim term).  Extrinsic evidence "is less significant than the intrinsic record in determining the legally operative meaning of claim language."  *See Phillips*, 415 F.3d at 1317-19 (citation and quotation marks omitted) (noting that the Federal Circuit has generally viewed extrinsic evidence "as less reliable than the patent and its prosecution history in determining how to read claims," and stating that courts should keep in mind the flaws inherent in that evidence).  Additionally, "[e]xtrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims."  *Markman*, 52 F.3d at 981.

With these principles in mind, the court will construe the disputed terms.[4]

## I.   '782 Patent

### A.   "re-spray tray" / "respray tray" (claims 16, 22)

| BAC's Proposed Construction | SPX's Proposed Construction |
| --- | --- |
| "a tray located between the direct and indirect evaporative cooling sections for collecting | "A tray located between the direct and indirect sections in a neutral (*i.e.*, dry) area of the inlet |

---

[4] The court accepts the parties' agreed constructions for the undisputed terms: (1) "providing"; (2) "coinciding with the point of overlap"; (3) "nest in the at least one depression area"; (4) "dimple"; (5) "the region of reduced diameter is provided only around the point of overlap in the return bends."  (*See* JCC 2.)

| unevaporated coolant and redistributing the liquid without the use of a pump" | plenum for mixing the evaporative liquid through gravitationally induced turbulent flow to achieve a uniform temperature of the liquid without the use of a pump." |
|---|---|
| **Court's Construction** | |
| "a tray located between the direct and indirect evaporative cooling sections for collecting unevaporated coolant and redistributing the liquid without the use of a pump" | |

BAC's proposed construction finds support in the '782 patent's specification and prosecution history.  First, the specification confirms the re-spray tray is located above the indirect section, (*see* '782 patent col. 2 ll. 22-24 ("[W]herein an intermediate collection of evaporative fluid is provided above the indirect evaporative section . . . .")), and below the direct section, (*see id.* at col. 2 ll. 37-39 ("[T]he utilization of a re-spray collection tray beneath the direct heat exchange section.")).  The figures depict preferred embodiments supporting this understanding of the re-spray tray's location.  (*See id.* at figs. 1, 6.)  Second, the specification shows the re-spray tray obviated any need for a pump, which was one of the "limitations [that] exist[ed] with the prior art . . . ."  (*Id.* at col. 1 ll. 11-20.)  Moreover, during reexamination, it was these two elements of the re-spray tray that BAC argued distinguished the '782 patent from the prior art.  (*See, e.g.*, SPX Br. Ex. 8, Suppl. Welch Decl. ¶ 32, ECF No. 91-9 ("As discussed above, the claimed 're-spray tray' must be positioned *below* the direct evaporative heat exchange section and *above* the indirect evaporative heat exchange section and collect and redistribute the evaporative liquid *without the use of a pump*." (emphases in original)).)  Finally, BAC's proposed construction is identical to the one the PTO gave during reexamination.  (*See* BAC Br. Ex. 12, Notice of Intent to Issue Ex Parte Reexamination Certificate, at BAC_042467, ECF No. 90-13 ("The specification is seen to pr[]ovide a special defin[i]tion of re-spray tray as a tray located between the direct and indirect evaporative cooling sections for collecting unevaporated coolant and redistributing the liquid without the use of a pump.").)

SPX tries to add two phrases, but neither is supported by the record.

First, SPX argues the re-spray tray must be located in a "neutral (*i.e.*, dry) area of the inlet plenum." During reexamination, BAC emphasized part of a quotation from the '782 patent that included this "inlet plenum" language. (*See* SPX Br. Ex. 4, Apr. 7, 2014 Response to Office Action, at 30, ECF No. 91-5.) And, in doing so, BAC used unequivocal language such as "clarifies the *requisite location* of the 're-spray tray,'" and "*definitively places* the re-spray tray . . . ." (*Id.* at 29-30 (emphases added).) SPX points to this language to argue that BAC limited the scope of its claim such that the re-spray tray must also be located in a "neutral area of the inlet plenum."

But a reading of BAC's statements in context clarifies that BAC never disavowed the claim scope as argued by SPX. The principal dispute during reexamination was about showing that the re-spray tray was located between the direct and indirect sections, and did not use a pump. Even though the "inlet plenum" language was included in the quotation that BAC took from the '782 patent, that language was not central to BAC's argument regarding the re-spray tray's location. In other words, that the "inlet plenum" language was emphasized is a coincidence. Indeed, elsewhere, BAC more precisely emphasized other language. (*See, e.g.*, Apr. 7, 2014 Response to Office Action, at 22 ("Further, the *re-spray tray is located* in a neutral area of the inlet plenum *between the direct and indirect heat exchange sections* and does not interfere with the natural streamlines of inlet air." (emphases in original) (quoting '782 patent col. 2 ll. 58-61)).) In summary, the "requisite location" and "definitively places" phrases were used to prove the re-spray tray was located between the direct and indirect sections, not to show that it was in a neutral area of the inlet plenum. At best, the alleged disavowal is ambiguous.

Accordingly, prosecution disclaimer regarding the "inlet plenum" language did not occur.  *See*

*Computer Docking Station Corp.*, 519 F.3d at 1375.

Second, SPX argues that "re-spray tray" includes a functional limitation: the tray is "for

mixing the evaporative liquid through gravitationally induced turbulent flow to achieve a

uniform temperature . . . ."  (*See* SPX Br. 12-16, ECF No. 91.)  To support its argument, SPX

cites to various statements made by Mr. Welch to the PTO during reexamination.  (*See, e.g.*, SPX

Br. Ex. 3, Welch Decl. ¶ 23, 26-27, ECF No. 91-4; Suppl. Welch Decl. ¶¶ 19, 21.)

Again, SPX misconstrues the point of Mr. Welch's declarations, which was to distinguish

the '782 patent's "re-spray tray" from prior art (i.e., the use of a sump and pump system in U.S.

Patent No. 5,435,382 ("'382 patent"))).  (*See* Welch Decl. ¶ 23 (reciting allegedly disclaimed

language to support the ultimate conclusion that "[t]hus, additional input energy for a pump is

not required in the Carter '782 device").)  In explaining how the re-spray tray worked, Mr.

Welch described some of the features and advantages derived from the use of the tray (as

opposed to a pump).  Those descriptions did include the language that SPX seeks to import into

the claims, but none of them were definitional.  Most telling is the fact that Welch states what the

'782 patent "allows"—rather than what it *requires*—the invention to do.  (*See, e.g.*, Suppl.

Welch Decl. ¶ 21.)  Because prosecution disclaimer does not apply "if the applicant simply

describes features of the prior art and does not distinguish the claimed invention based on those

features," *Computer Docking Station Corp.*, 519 F.3d at 1375 (citation omitted), BAC did not

disclaim this language here.

In sum, SPX attempts to import limitations regarding preferred features of the claimed

invention into the claims.  But "the court's task is not to limit claim language to exclude

6

particular devices because they do not serve a perceived 'purpose' of the invention." *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003).

### B.   "generally" (claims 16, 17, 18, 21, 22, 23, 26)

| BAC's Proposed Construction | SPX's Proposed Construction |
|---|---|
| None required.  Alternatively, "primarily." | "Primarily, with few or no exceptions." |
| **Court's Construction** ||
| None required. ||

"Generally" does not need to be construed here because it is a common word whose plain and ordinary meaning is clear on its face.  Significantly, neither party has argued that the word carries a specialized meaning here.  In fact, "[t]he written description does not specify any special definition for the term[] 'generally,'" *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1311 (Fed. Cir. 2003), which further suggests the word should carry its plain and ordinary meaning.[5]  Further, "primarily" finds no support in the specification or prosecution history.  The '782 patent does not even mention the word, and BAC's statements before the PTO did not advance the position that "generally" meant "primarily."

### C.   "moving air generally upwardly through the direct evaporative section" (claim 16)

| BAC's Proposed Construction | SPX's Proposed Construction |
|---|---|
| None required.  Alternatively, "moving air in a generally upward direction through the direct evaporative section" | "moving air in a primarily upward direction throughout the entire direct evaporative section" |
| **Court's Construction** ||

---

[5] Although SPX originally proposed a far narrower construction in the amended joint claim construction statement, it did not support that specific construction in its briefing, instead stating, "[t]o reduce issues before the Court, SPX agrees to construe 'generally' . . . as 'primarily,' as asserted by BAC."  (SPX Br. 16.)  SPX appears to misread BAC's primary position, which is that "[the] phrase ['generally'] requires no construction beyond the claim language, which is clear on its face."  (JCC 3.)  "Primarily" is BAC's fallback position.  (*See id.* (BAC proposing that "generally" should mean "primarily" only "[t]o the extent the Court construes th[e] phrase"); *see also* BAC Resp. Br. 16, ECF No. 94 ("Contrary to Defendants' repeated statement, BAC *does not* agree that 'generally' means 'primarily.'  Rather, BAC contends that the claim term 'generally' should not be construed." (emphasis in original) (citations omitted)).)  Accordingly, many of SPX's arguments fail because they (improperly) proceed on the premise that "generally" means "primarily."  (*See, e.g.*, SPX Br. 20-21 (concluding that, because "the parties have agreed that 'generally' means *at least* 'primarily[,]' . . . a single device cannot have air flow that is both primarily upward and primarily horizontal in the same section of the accused device" (emphasis in original)).)

| "moving air in a generally upward direction through the direct evaporative section" |
| --- |

BAC's alternative construction clarifies the meaning of "upwardly." SPX's construction replaces "generally" with "primarily," but this change, as already noted, has no basis in the intrinsic record, and will therefore be rejected. SPX also asserts that air must move "throughout the entire" section, but nothing in the intrinsic record suggests that, for air to move "through" an area, it must move throughout the *entire* area. In fact, the inventor used the word "entire" multiple times in the '782 patent, but never with respect to airflow through an evaporative section. (*See, e.g.*, '782 patent col. 1 ll. 49-52 ("[T]he falling water is not pulled in uniformly over the *entire* plan area . . . ."(emphasis added)); *id.* at col. 4 ll. 6-7 ("Re-spray tray 26 is seen to extend and block the *entire* structure below direct evaporative section 20 . . . ." (emphasis added)); *id.* at col. 5 ll. 50-51 ("[E]vaporative liquid may be distributed across the *entire* length of re-spray branches 130." (emphasis added)).) This suggests that, when the inventor chose the word "through," he meant "through," and not "throughout the entire."

### D.  "moving air generally across the direct evaporative section" (claim 22)

| BAC's Proposed Construction | SPX's Proposed Construction |
| --- | --- |
| None required.  Alternatively, "moving air generally cross-current to the flow of evaporative liquid through the direct evaporative section" | "moving air from one side of the direct evaporative section to the other in a direction that is primarily cross current to the downward flow of liquid in the direct section" |
| **Court's Construction** ||
| "moving air generally cross-current to the flow of evaporative liquid through the direct evaporative section" ||

The court adopts the parties' reasonable clarification that the air moves "cross-current," as opposed to simply "across." The description of the second preferred embodiment (as shown in figure 6) uses this term. (*See* '782 patent col. 5 ll. 32-35 ("[T]he airflow across direct evaporative section 120 is cross-current to the downward flow of evaporative liquid . . . .").) For the same reasons that the court did not construe "generally" to mean "primarily," the court

rejects SPX's proposed substitution of the word "primarily" for "generally."  The court also

rejects SPX's proposal that air must move "from one side of the direct evaporative section to the

other . . . ."  This proposed construction confuses sufficient with necessary conditions; that air

flows from one side to the other would be *sufficient* to show movement "across" a section, but

nothing in the specification suggests it is *necessary* to show such movement.[6]

### E. "generally downwardly across" (claim 16) AND "generally downwardly and across" (claims 18, 22, 23)

| BAC's Proposed Construction | SPX's Proposed Construction |
| --- | --- |
| Not indefinite, and none required. | Indefinite. |
| **Court's Construction** | |
| Not indefinite, and none required. | |

Although the amended joint claim construction statement reflects SPX's position that

these terms are indefinite, (*see* JCC 5), SPX appears to have dropped its indefiniteness argument

in both its opening and response briefs.  (See SPX Br. 16-20; SPX Resp. Br. 7-8, ECF No. 95.)

Accordingly, SPX has waived that argument.  *See Elderberry of Weber City, LLC v. Living*

*Centers-Se., Inc.*, --- F.3d ---, No. 13-2176, 2015 WL 4717744, at *7 (4th Cir. Aug. 10, 2015)

("[T]his Court normally views contentions not raised in an opening brief to be waived." (citation

omitted)); *SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1085 (Fed. Cir. 2014) ("Our law is

---

[6]  SPX also makes an argument concerning the "conflicting nature" of BAC's infringement contentions.  BAC has accused the same device of meeting the direct evaporative section airflow limitations in *both* claim 16 and claim 22.  In SPX's view, however, [t]he same device cannot legitimately be accused of having both upward air flow . . . as required by claim 16, while also having airflow that is cross-current (*i.e.*, perpendicular and generally horizontal) . . . as required by claim 22."  (SPX Br. 20-21.)

   It is unclear what SPX seeks to accomplish with this argument.  That a single embodiment cannot simultaneously satisfy two separate claims has no bearing on the proper construction of a phrase.  Moreover, even assuming the direct evaporative section airflow limitations in claims 16 and 22 were mutually exclusive, no rule precludes BAC from asserting the two claims simultaneously.  *Cf.* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").  In any event, the intrinsic record suggests that, in fact, embodiments can simultaneously "mov[e] air generally upwardly through" and "mov[e] air generally across" a section.  Indeed, claim 22 contemplates this very possibility by requiring that air move "generally downwardly *and* across the indirect evaporative section." ('782 patent col. 9 ll. 19-20 (emphasis added).)

well established that arguments not raised in the opening brief are waived." (citation omitted)).[7]

At any rate, the court concludes that the phrases are not indefinite and require no construction.

###### F. "moving air generally downwardly across the indirect evaporative section" (claim 16) AND "moving air generally downwardly and across the indirect evaporative section" (claim 22)

| BAC's Proposed Construction | SPX's Proposed Construction |
| --- | --- |
| None required.  Alternatively, "moving air in a generally downward direction and generally cross-current to the flow of evaporative liquid through the indirect evaporative section" | "Moving air primarily downwardly over the entire indirect section so as to prevent dry areas resulting from the pull of evaporative liquid by the horizontal flow of inlet air." |
| Court's Construction | |
| "moving air in a generally downward direction and generally cross-current to the flow of evaporative liquid through the indirect evaporative section" | |

The court adopts BAC's construction, which reasonably clarifies the direction of air flow in the indirect evaporative section.  The court rejects SPX's proposed inclusion of "entire" for the same reasons as those the court gave regarding the phrase, "moving air generally upwardly through the direct evaporative section."  The court also rejects the "so as to prevent dry areas" language for substantially the same reasons warranting rejection of the functional limitation in SPX's construction of "re-spray tray."  In short, SPX improperly attempts to import a desired feature of the invention into an air flow term.  *See Purdue Pharma*, 438 F.3d at 1136 (concluding that "[the patentee]'s statements d[id] not amount to a clear disavowal of claim scope" because, "[r]ather than presenting the four-fold dosage range as a necessary feature of the claimed oxycodone formulations, [the patentee] described it as a property of, or a result of administering, the oxycodone formulations . . . .").

###### G. "collecting the evaporative liquid that passes through the direct evaporative section in a re-spray tray" (claims 16, 22)

| BAC's Proposed Construction | SPX's Proposed Construction |
| --- | --- |
| None required.  Alternatively, the plain and | "Collecting evaporative liquid from the direct |

---

[7] To be clear, SPX's arguments concerning other phrases that include the words "generally downwardly across" and "generally downwardly and across" are not waived.

| ordinary meaning based on BAC's proposed construction for "re-spray" or "respray" above. | evaporative section in a tray located between the direct and indirect sections in a neutral (*i.e.*, dry) area of the inlet plenum and mixing the liquid through gravitationally induced turbulent flow to achieve a uniform temperature of the liquid without the use of a pump." |
|---|---|
| **Court's Construction** ||
| None required. ||

The parties' respective positions on this phrase essentially incorporate the parties' respective positions on "re-spray tray." Accordingly, in light of the court's construction for that phrase, this phrase needs no additional construction. In any event, the phrase is clear on its face, and SPX's arguments for its proposed construction are unpersuasive for the same reasons as its arguments regarding "re-spray tray."

### H. "spraying the collected evaporative liquid through a plurality of re-spray nozzles downwardly onto the indirect evaporative section" (claims 16, 22)

| BAC's Proposed Construction | SPX's Proposed Construction |
|---|---|
| None required. Alternatively, "spraying the collected evaporative liquid through more than one re-spray nozzle downwardly onto the indirect evaporative section" | "Spraying a thermally equalized evaporative liquid downwardly using re-spray nozzles directly onto the plurality of circuits, not into the plenum area. The plenum area is an air filled space." |
| **Court's Construction** ||
| "spraying the collected evaporative liquid through more than one re-spray nozzle downwardly onto the indirect evaporative section" ||

Although the language is clear on its face, BAC's alternative construction accurately clarifies the meaning of "plurality." *See Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1327-28 (Fed. Cir. 2001) ("[W]e have held that 'plurality,' when used in a claim, refers to two or more items, absent some indication to the contrary." (citation omitted)). SPX's proposed construction attempts to import two phrases, but neither is supported by the record.

Although it initially proposed inclusion of the phrase "thermally equalized" in its construction, SPX did not mention the phrase again in its opening brief, (*see* SPX Br. 23-26),

which suggests it waived its argument on that phrase.  In any event, the phrase finds no support in the '782 patent—it is not used even once.  This phrase is further rejected for the same reasons the court rejected SPX's proposed inclusion of the functional limitation to "re-spray tray."

As for the phrase "directly onto the plurality of circuits, not into the plenum area," SPX "seeks to give effect to the distinctions that BAC repeatedly made during prosecution[,]" which is that, in order to overcome the Baird reference, BAC took the position that the collected evaporative liquid had to flow directly onto the coil section, and could not pass through the plenum area.  (SPX Br. 24.)

This misconstrues BAC's argument during reexamination, which concerned what constituted air flow across the "indirect evaporative section" in the '782 patent.  The PTO initially concluded that the Baird reference disclosed air flowing across the "indirect evaporative section[,]" even if it did not disclose air flowing "across the pipes containing the fluid to be cooled."  (SPX Br. Ex. 11, April 30, 2014 Office Action, at 12-13, ECF No. 91-12.)  SPX argued that this conclusion was incorrect because the '782 patent stated that the "indirect evaporative section" comprised "a plurality of circuits each conducting a fluid stream[,]" yet the PTO's conclusion did not require air flow over the plurality of circuits.  (BAC Br. Ex. 11, June 30, 2014 Response to Office Action, at 33, ECF No. 90-12.)  In other words, BAC's position was that "[t]he claimed airflow cannot be met *solely* by airflow in the plenum area above/or and below the cooling coils as the Office suggests."  (*Id.* at 35 (emphasis added).)  Rather, at least *some* of the air had to "flow across the pipes containing the fluid to be cooled."  (*Id.* at 33.)  To support its argument that the "indirect evaporative section" was a "physical structure" composed of a plurality of circuits, and could not be solely a "plenum area," BAC used the "not into the plenum area" language.  (Id. at 34.)  Within this context, then, BAC did not disclaim that either air or

evaporative liquid *could not* pass through the plenum area.  Finally, SPX's construction fails

because it would exclude both embodiments in the '782 patent, each of which has some air-filled

space between the re-spray nozzles and indirect evaporative section.  (*See* '782 patent figs. 1, 6.)

## II.  '685 Patent

### A.  "depression area" (claims 1, 2, 3, 4, 6, 8, 11, 13, 20)

| BAC's Proposed Construction | SPX's Proposed Construction |
|---|---|
| None required.  Alternatively, "area of depression" | "An area where the outer perimeter of a tube is displaced inwardly so as to lie below the surrounding surface of the tube" |
| **Court's Construction** | |
| None required. | |

The language of this phrase is clear on its face.  And if there were any doubt about what

constitutes a "depression," the specification removes that doubt.  (*See* '685 patent col. 8 ll. 42-44

("The depressions can include indentations, hollows, grooves, notches or dimples, for example,

that reduce the outer dimensions of the tubing at regions of overlap.").)  Additionally, in a prior

case construing the '685 patent, the court concluded that no construction was required for this

phrase.  *See Baltimore Aircoil Co. v. Evapco, Inc.*, Civil No. CCB-09-18, 2010 WL 147799, at

*2 (D. Md. Jan. 11, 2010).  The court rejects SPX's proposed construction because it is too

limiting and uses terminology (such as "displaced inwardly") that has no basis in the record,

even if that construction might be a plausible way to describe "depression area."

### B.  "each depression area defining a region of reduced diameter" (claim 20)

| BAC's Proposed Construction | SPX's Proposed Construction |
|---|---|
| "each depression area has a region with a diameter across the tube cross-section in the stacking or overlapping direction that is smaller than the diameter of the non-depressed region of the return bend" | "Each depression area has a region with a diameter that is smaller than the diameter of the non-depressed regions of the tube" |
| **Court's Construction** | |
| "each depression area has a region with a diameter across the tube cross-section in the stacking or overlapping direction that is smaller than the diameter of the non-depressed region of the | |

| return bend" |
|---|

In the prior *Evapco* case, the court adopted this exact construction.  *See id.*  Moreover, the

specification supports this construction.  (*See, e.g.*, '685 patent col. 8 ll. 61-63 ("The term

'diameter' . . . is to be understood as the diametrical distance across the tube cross-section in the

stacking or overlapping direction.").)  The court rejects SPX's proposed construction because it

does not specify the direction in which one measures the diameter.

### C.  "effective diameter D" AND "D is the effective diameter of the tubes" (including citations to "diameter" and "diameter D") (claims 1, 2, 8, 13, 20, 21, 22)

| BAC's Proposed Construction | SPX's Proposed Construction |
|---|---|
| Not indefinite, and none required. Alternatively, "effective diameter denoted by 'D' and calculated by the formula in the specification of the '685 Patent at column 2, lines 56-58 ('When a non-circular cross section is used, the outside perimeter of the tube divided by pi is considered as the effective diameter D.')" | Indefinite.  Alternatively, "D is the effective diameter of every tube along its entire length, except at the at least one area of depression" |
| Court's Construction ||
| Not indefinite, and "D is the effective diameter of every tube along its entire length, except at the at least one area of depression" ||

"A claim is invalid for indefiniteness if its language, when read in light of the

specification and the prosecution history, 'fail[s] to inform, with reasonable certainty, those

skilled in the art about the scope of the invention.'"  *Biosig Instruments, Inc. v. Nautilus, Inc.*,

783 F.3d 1374, 1377 (Fed. Cir. 2015) (alteration in original) (quoting *Nautilus, Inc. v. Biosig

Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014)).  Applying this standard here, the court

concludes that the diameter terms do not render indefinite the '685 patent's claims.

SPX's first argument for indefiniteness relies on the '685 patent's apparent use of two

different definitions when measuring the "diameter" of a circuit that has a "non-circular cross

section."  One part of the patent states:

> [T]he coil assembly is arranged to have individual circuits of an effective
> diameter D and a circuit-to-circuit spacing S that is less than D.  When a non-
> circular cross section is used, the outside perimeter of the tube divided by pi is
> considered as the effective diameter D.

('685 patent col. 2 ll. 53-58.)  Another part of the patent states:

> [I]n some instances it may be preferred to use tubes of non-circular cross section.
> The term 'diameter' in such cases is to be understood as the diametrical distance
> across the tube cross-section in the stacking or overlapping direction.  This may
> also sometimes be referred to as the projected cross-sectional area when the tube
> is not round.

(*id.* at col. 8 ll. 59-63.)  In SPX's view, the patent is littered with references to "diameter," and, in light of the above competing definitions of "diameter," a skilled artisan would not be able to figure out, with reasonable certainty, the scope of the claimed invention.

The presumption that SPX begins with is correct: "the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims."  *Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1087 (Fed. Cir. 2009) (citations and internal quotation marks omitted).  But the '685 patent unambiguously shows that this case is not one in which the same term (i.e., the purported single "diameter" term) appears in different portions of the claims with different meanings.  On the contrary, there are *two different* terms, each of which uses the word "diameter": (1) "region of reduced diameter" and (2) "effective diameter D."

SPX's argument that the '685 patent employs the word "diameter" in only one way is foreclosed first by the claim language itself.  Dependent claim 21 is instructive.  That claim covers "[t]he coil assembly according to claim 20, wherein the region of reduced *diameter* has a

depth of between 2.5-50% of tube *diameter* D."[8]  ('685 patent col. 14 ll. 39-41 (emphases

added).)  If the two uses of the word "diameter" in that claim were interchangeable—and thus

would have to have the same meaning, as SPX asserts is the case—then the claim would require

a value to be equal to a certain percentage of that *very same* value.  That reading of the '685

patent makes no sense.  Instead, the use of "diameter" in the phrase "region of reduced diameter"

differs from the use of "diameter" in the phrase "effective diameter D."  And, because those

phrases are distinct, they also can be defined differently without creating indefiniteness issues.

    SPX's argument is also foreclosed by the specification.  Contrary to SPX's view, the

specification clarifies how the two definitions noted above correspond to the two different

phrases that employ the word "diameter."  The first definition is linked to the phrase "effective

diameter D."  That definition is in a part of the "Summary of the Invention" section that

discusses the invention's "increase[d] bundle density" compared to the prior art.  (*See id.* at col.

2 ll. 28-58.)  Thus, this part of the specification explains that, when calculating circuit density—

which is defined as the effective diameter D divided by S, (*see, e.g.*, *id.* at col. 12 ll. 51-53

(noting a "circuit-to-circuit packing density D/S . . . , where S is the spacing between each

adjacent circuit and D is the effective diameter of the tubes"))— for tubes using a non-circular

cross section, "the outside perimeter of the tube divided by pi is considered as the effective

diameter D."  (*Id.* at col. 2. ll. 56-58.)  The second definition, on the other hand, is linked to the

phrase "region of reduced diameter."  This definition is in a part of the "Detailed Description of

Preferred Embodiments" section that discusses "depressions."  (*See id.* at col. 8 ll. 42-65.)  This

part thus sheds light on those claims involving a "depression area defining a region of reduced

diameter" (i.e., claims 20-22) by indicating the direction in which to measure the reduction in

---

[8] Claim 21 depends on claim 20, which requires "circuit[s] including longitudinal tube sections of an effective diameter D . . . ."  ('685 patent col. 14 ll. 16-18.)  So "effective diameter D" is the antecedent of "tube diameter D."

diameter of a given depression area: in that context, the "term 'diameter' . . . is to be understood as the diametrical distance across the tube cross-section in the stacking or overlapping direction." (*Id.* at col. 8, ll. 61-63.)  In sum, even accepting that the '685 patent is not a model of clarity when it comes to defining and using the diameter terms, a skilled artisan, reading the patent as a whole, would know, with reasonable certainty, how to discern the scope of the invention.

In their briefing, the parties present the deposition testimony of several experts, each of whom has an opposing view of what the '685 patent covers.  Because the intrinsic evidence, standing alone, provides sufficient clarity, the court declines to rely on this extrinsic evidence. *See Vitronics Corp.*, 90 F.3d at 1583 ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term.  In such circumstances, it is improper to rely on extrinsic evidence." (citations omitted)); *cf. Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 908 (Fed. Cir. 2005) ("As [the disputed term] has unambiguous meaning in view of the intrinsic record, the district court erred in relying upon extrinsic evidence that directly contradicted that meaning.").

Even were the court to rely on the expert testimony, the court's conclusion would not change.  As a preliminary matter, given the significance of tiny linguistic nuances in this dispute, it is clear that the expert testimony must be considered with some caution.  The deposition transcripts reflect that counsel crafted lines of questioning that elicited certain answers favorable to each side.  Thus, even if relevant, this testimony simply should not cloud the unambiguous meaning already provided by the intrinsic evidence.  *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("It is not uncommon in patent cases to have such dueling experts.  When construing claims, however, the intrinsic evidence and particularly the claim language are the primary resources.").  More importantly, the expert testimony, if anything,

*confirms* the view that there is more than one term using the word "diameter."  SPX's own

expert, Dr. Dorgan, unambiguously supports this view.  After examining claim 21, Dr. Dorgan

was asked "how many diameters are referenced in Claim 21 of the '685 patent," to which he

responded, "there is a 'reduced diameter' and 'tube diameter D.'"  (BAC Resp. Br. Ex. 24,

Dorgan Dep. 182:24-183:13, ECF No. 94-4.)  When asked to confirm if "the reduced diameter

and the tube diameter D [were] two different things[,]" Dr. Dorgan responded, "the reduced

diameter . . . [is] related to the depression. . . .  It's not the tube diameter D, as such."  (*Id.* at

183:15-23.)  BAC's expert, Mr. Welch, shares this view.  (*See, e.g.*, BAC Resp. Br. Ex. 26,

Welch Decl. ¶ 49, ECF No. 94-6 ("I understand from reading the '685 Patent that the terms

'effective diameter D' and 'region of reduced diameter' have different meanings.").)  Thus, even

though the court accepts into the record the parties' supplemental briefs, which largely focus on

the experts, the court gives the expert testimony little to no weight.

SPX's second argument is that a skilled artisan would not know at what point to measure

diameter.  But the patent provides guidance on this point.  Specifically, figures 6 and 8 show that

"effective diameter D" is measured at the circular portion of a coil's return bend.  (*See* '685

patent figs. 6, 8.)  This indefiniteness argument fails.

SPX's final argument is that, regardless of how diameter is ultimately measured, it must

have the same value for every tube at every location along each tube excepting the depression

area; absent such uniformity, a skilled artisan would not be able to discern the scope of the

claimed invention.  The court agrees that "effective diameter D" constitutes a single value along

the entire length of every tube with the exception of the depression area.  The relevant claims

themselves refer to "D" as being the "effective diameter of *the* tubes," and not simply the

effective diameter of some *section* of a tube, or some *subset* of tubes.  ('685 patent col. 12 l. 53.)

The relevant figures likewise show this uniformity, making no indication that D can have multiple values.  (*See id.* at figs. 5-8 (showing different coils in the same array having identical "D" values).)  Other parts of the specification confirm this point.  (*See, e.g.*, *id.* at col. 2 ll. 53-55 ("[T]he coil assembly is arranged to have individual circuits of an effective diameter D . . . .").)  Even BAC concedes that "one of ordinary skill in the art would recognize that coils are made with circuits of the same dimensions."  (BAC Resp. Br. 48.)

BAC protests the "import[ation] of unwarranted uniformity limitations into the claims." (BAC Br. 42, ECF No. 90.)  Specifically, BAC asserts that, because every asserted claim is "limited to 'an array of *at least two serpentine circuits*[,]' . . . a coil that includes, for example, twenty circuits may infringe if at least two of those circuits meet the claim limitations." (*Id.* at 42-43 (emphasis in original).)  This misreads what the '685 patent covers.  The "at least two" language merely dictates the size of a given "array"; in other words, an array must have more than one circuit.  But the rest of the claim language makes clear that "*each* circuit"—not simply two circuits—has "an effective diameter D."  ('685 patent col. 13 ll. 24-26 (emphasis added); *see also id.* at col. 14 ll. 16-18 ("[A]n array of at least two serpentine circuits, each circuit including longitudinal tube sections of an effective diameter D . . . .").)

In sum, the court concludes that SPX has not shown by clear and convincing evidence that the diameter terms are indefinite.  But SPX has shown that "effective diameter D" has a single value throughout the claimed invention.

### D.   "are densely packed" (claims 1, 13, 20)

| BAC's Proposed Construction | SPX's Proposed Construction |
| --- | --- |
| None required.  Alternatively, "arranged together" in the manner required by the remainder of the "wherein" clause | "Include more tubes in a given coil footprint or casing" |
| **Court's Construction** ||
| None required. ||

This phrase needs no additional construction.  SPX argues the claims "leave[] open the question as to what it means to be 'densely packed.'"  (SPX Br. 49.)  But, as BAC persuasively argues, the patent itself answers that question.  In claims 1 and 13, the "so that" clauses go on to explain the density by which adjacent circuits must be packed.  ('685 patent col. 12 ll. 48-53; *id.* at. col. 13 ll. 42-47.)  Claim 20 does not use the "so that" language, but the rest of the "wherein" clause defines the degree to which the circuits are packed.  (*Id.* at col. 14 ll. 33-38.)  These definitions control.  *See Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009).

SPX also argues the phrase encompasses more than just bundles "with a certain D/S measurement"; the increased D/S ratio serves the "purpose" of allowing more coils to fit into a given space, or the same number of coils to fit into a smaller space.  (SPX Br. 49-50.)  Although the invention has the objective SPX asserts, density is, in fact, defined using D/S ratios—the first paragraph of the specification shows this is so.  (*See* '685 patent col. 1 ll. 13-15 ("This invention relates to a heat exchange tube bundle" in which the bundle is arranged "so that resultant overlapping tubes can be packed with an increased density in which the circuit-to-circuit spacing between adjacent tubes is less than the projected cross-sectional area of the individual tubes.").)

**E. "are densely packed . . . to provide a circuit-to-circuit packing density D/S greater than 1.02" (claims 1, 13) AND "are densely packed with . . . S between each adjacent circuit that is less than the effective diameter D of the tubes." (claim 20)**

| BAC's Proposed Construction | SPX's Proposed Construction |
|---|---|
| None required.  Construction would be unhelpful to jury.  Alternatively, "arranged together" in the manner required by the remainder of the "wherein" clause | "Include more tubes in a given coil footprint or casing . . . than would be possible with a packing density D/S less than or equal to [1.02 / 1]" |
| **Court's Construction** | |
| None required. | |

For the reasons already noted above, these phrases need no additional construction.

**F.   "S is the spacing between each adjacent circuit" (claims 1, 13)**

| BAC's Proposed Construction | SPX's Proposed Construction |
|---|---|
| None required.  Alternatively, "adjacent circuits have a spacing S between them" | "S is the spacing between every adjacent circuit in the direction of stacking at every point between the adjacent circuits" |
| **Court's Construction** ||
| "S is the spacing between every adjacent circuit in the direction of stacking at every point between the adjacent circuits" ||

The court agrees with SPX that S is the spacing at every point between every adjacent circuit for reasons analogous to those provided for the court's construction of the diameter terms. Simply put, the relevant claims state that "S is *the* spacing between *each* adjacent circuit[,]" ('685 patent col. 12 l. 52 (emphases added); *see also id.* at col. 13 l. 46), not just *some* adjacent circuits.  Moreover, the specification consistently emphasizes the uniform spacing of the coil assembly, (*see, e.g.*, '685 patent col. 2 ll. 33-36 ("There is a particular need for a heat exchanger tube bundle design that increases bundle density uniformly, so that all circuits can maintain consistent functionality.")), which suggests the claims reflect that uniformity.  In fact, the specification acknowledges that the prior art had attempted to increase bundle density, but did so in ways that had not achieved density "uniformly on the tube bundle[.]"  (*Id.* at col. 2 l. 14; *see also id.* at col. 2. ll. 24-25 (noting that prior art's "increased density was not controllably uniform or precise").)  And the "particular need" the invention was designed to address was a "design that increases bundle density *uniformly*, so that all circuits can maintain consistent functionality." (*Id.* at col. 2 ll. 33-37 (emphasis added).)  In light of the claims and the specification, uniform spacing is required between each circuit.

BAC responds by arguing that the doctrine of claim differentiation requires a different result.  Specifically, because another claim (i.e., claim 20) uses the phrase, "a *uniform* circuit-to-

circuit spacing S between each adjacent circuit," ('685 patent col. 14 ll. 35-37 (emphasis added)), the present phrase (which is found in claims 1 and 13) cannot also demand uniformity.  But "claim differentiation is not a hard and fast rule."  *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014), *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005).   Here, that presumption is rebutted by the specification, which consistently refers to uniformity and, indeed, defines that as the invention's key objective. Moreover, "two claims with different terminology can define the exact same subject matter[,]" *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) (citations omitted), which appears to be the case here.  The language in claims 1 and 13 focus on a ratio, while the language in claim 20 considers the difference between two terms.  (*Compare* '685 patent col. 13 ll. 45-47 ("D/S greater than 1.02"), *with id.* at col. 14 ll. 35-38 ("S . . . is less than . . . D").)  By defining a ratio, claims 1 and 13 imply that any value in that ratio has a single value; accordingly uniformity is required.

### G.  "a uniform circuit-to-circuit spacing S between each adjacent circuit" (claim 20)

| BAC's Proposed Construction | SPX's Proposed Construction |
| --- | --- |
| None required.  Alternatively, "adjacent circuits have a uniform spacing S between them" | "S is the spacing between every adjacent circuit in the direction of stacking at every point between the adjacent circuits" |
| **Court's Construction** | |
| "S is the spacing between every adjacent circuit in the direction of stacking at every point between the adjacent circuits" | |

For the reasons provided for the court's construction of the previous phrase, the court adopts SPX's proposed construction.

**CONCLUSION**

BAC's motion to strike will be denied, and BAC's motion for leave to file a supplemental

brief will be granted.  The construction of each disputed claim term is set forth in a separate

Order which follows.


August  28, 2015                                                    /S/
            Date                                    Catherine C. Blake
                                                    United States District Judge