## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BALTIMORE AIRCOIL COMPANY, INC.    :
                                       :
                                       :
      v.                           :   Civil No. CCB-13-2053
                                       :
                                       :
SPX COOLING TECHNOLOGIES INC., et al. :

## MEMORANDUM

Baltimore Aircoil Company, Inc. ("BAC") filed this lawsuit against SPX Cooling Technologies, Inc., Sanderson Farms, Inc., and Eagle Mountain International Church Inc. (collectively, "SPX"), asserting infringement of U.S. Patent No. 7,107,782 ("the '782 patent") and U.S. Patent No. 6,820,685 ("the '685 patent"), both of which relate to heat exchanger technology used in industrial cooler systems.  BAC is a worldwide manufacturer and marketer of heat transfer and ice thermal storage products.  SPX is a competitor in the industry related to fluid coolers.  It manufactures and sells the accused product, the Marley MH Fluid Cooler. Defendants Eagle Mountain International Church and Sanderson Farms each purchased a Marley MH Fluid Cooler from SPX.

Several motions are now pending before the court.  SPX has filed (1) a motion to strike BAC's expert report with respect to the doctrine of equivalents; (2) a motion for summary judgment of non-infringement of claims 16-18, 21-23 and 26 of the '782 patent and that BAC is not entitled to an earlier invention date for claims 22, 23, or 26; (3) a motion to exclude portions of the expert reports of Jeffrey K. Welch; (4) a motion to exclude the testimony of Ryan Herrington; (5) a motion for partial summary judgment of unenforceability due to laches, no willful infringement, and no entitlement to lost profits; and (6) a motion to strike the declarations

of Kavita Vallabhaneni and Ryan Herrington.  BAC has filed (1) a motion to strike SPX's late-produced documents and its reliance on those documents in expert reports; (2) a motion to exclude opinions of Kimberly J. Schenk; (3) a motion to exclude opinions of James D. Wright; (4) a motion for summary judgment of no invalidity under 35 U.S.C. § 102(g); and (5) a motion for summary judgment of infringement.  For the reasons that follow, BAC's motion for summary judgment of infringement, (ECF No. 148), will be granted in part and denied in part; BAC's motion for summary judgment of no invalidity, (ECF No. 146), will be denied; SPX's motion for summary judgment of noninfringement, (ECF No. 133), will be granted in part and denied in part; BAC's motion to exclude the opinions of James Wright, (ECF No. 144), will be denied; SPX's motion to exclude portions of the expert reports of Jeffrey K. Welch, (ECF No. 134), will be granted in part and denied in part; SPX's motion to strike the portions of Mr. Welch's expert report regarding the doctrine of equivalents, (ECF No. 120), will be granted; BAC's motion to strike late produced documents, (ECF No. 140), will be granted in part and denied in part; SPX's motion to strike the declarations of Kavita Vallabhaneni and Ryan Herrington, (ECF No. 184), will be denied; BAC's motion to exclude the opinions of Kimberly J. Schenk, (ECF No. 142), will be granted; SPX's motion to exclude portions of the opinions of Ryan Herrington, (ECF No. 136), will be granted in part and denied in part; and SPX's motion for summary judgment on the issue of laches and no lost profits, (ECF No. 138), will be denied.

## I.     BAC's Motion For Summary Judgment of Infringement of Claim 22

BAC moves for summary judgment of infringement of claim 22 of the '782 patent.  "A determination of infringement involves two steps: First, the court determines the scope and meaning of the asserted patent claims. The court then compares the properly construed claims to the allegedly infringing device to determine whether all of the claim limitations are present, either literally or by a substantial equivalent." *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637

F.3d 1314, 1318–19 (Fed. Cir. 2011).  Claim construction is a question of law whereas the

second step, whether the accused product actually infringes the patent, is a question of fact.  *Id.*

at 1319.  Accordingly, the court may grant BAC's motion if no reasonable jury could conclude

the MH Fluid Cooler is missing at least one limitation from Claim 22.  *See id.*

Claim 22 covers:

> A method of exchanging heat comprising the steps of
>
> [1] providing a heat exchange apparatus having a direct evaporative section and an indirect evaporative section,
> [2] the direct evaporative section comprising a plurality of fill sheets,
> [3] the indirect evaporative section comprising a plurality of circuits each conducting a fluid stream,
> [4] spraying an evaporative liquid generally downwardly through the direct evaporative section,
> [5] moving air generally across the direct evaporative section,
> [6] collecting the evaporative liquid that passes through the direct evaporative section in a respray tray,
> [7] spraying the collected evaporative [liquid] through a plurality of re-spray nozzles downwardly onto the indirect evaporative section,
> [8] and moving air generally downwardly and across the indirect evaporative section.

(Pl.'s Mot. Summ. J. Infringement, Ex. A, '782 col. 9 I. 5–20, ECF No. 149-3).[1]

As an initial matter, SPX concedes the accused device is a "method of exchanging heat"

and that several of claim 22's limitations apply to the MH Fluid Cooler; namely, limitations 1, 2,

3, 5, and 7.  (Pl.'s Mot. Summ. J. Infringement, Ex. FF, Stratman Dep. 438:15–452:4, ECF No.

149-35).[2]  Accordingly, to obtain summary judgment of infringement, BAC must establish that

---

[1] Following a *Markman* hearing, the court issued a memorandum and order construing several of these terms.  (Memorandum, ECF No. 113; Order, ECF No. 114).  To the extent additional claim construction is necessary, the court may consider arguments made by the parties but not raised in the *Markman* hearing.  *Cf. SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1291 (Fed. Cir. 2005) (noting that, as a case progresses, "the court expects the parties to refine the disputed issues and learn more about the claim terms and technology, at which point a more accurate claim construction can be attempted").

[2] In response to BAC's statement of facts, SPX appear to dispute that the limitation "moving air generally across the direct evaporative section" applies to the MH Fluid Cooler.  (Opp'n Pl.'s Mot. Summ. J.

limitations 4, 6, and 8 also apply to the MH Fluid Cooler.  For the reasons discussed below, these limitations do apply to the accused product, and BAC is entitled to summary judgment of infringement of claim 22.[3]

### A.   [4] "spraying an evaporative liquid generally downwardly through the direct evaporative section"

SPX contends the limitation "spraying an evaporative liquid generally downwardly through the direct evaporative section" does not apply to the MH Fluid Cooler.  The only component of this limitation addressed in the court's *Markman* order is the term "generally," which the court did not construe because "it is a common word whose plain and ordinary meaning is clear on its face."  (Memorandum 7, ECF No. 113).  The parties now dispute the construction of the limitation as a whole.

SPX contends the word "through" should be afforded its plain and ordinary meaning. They argue for a claim construction that requires evaporative liquid to be "sprayed in one end or side of the direct evaporative section of the MH Fluid Cooler and [sprayed] out through the other."  (Opp'n Pl.'s Mot. Summ. J. Infringement 40, ECF No. 156).  Pointing to other claims in the '782 patent referencing evaporative liquid being sprayed "across" or "onto" the direct evaporative section, SPX cites the proposition that "[i]n the absence of any evidence to the contrary, [the Court] must presume that the use of . . . different terms in the claims connotes different meanings."  *Id.* at 41 (quoting *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co.*

---

Infringement 10, ECF No. 156).  It does not, however, raise this issue in the argument section of its brief. Additionally, two of defendant SPX's corporate representatives testified that the MH Fluid Cooler moves air generally across the direct evaporative section.  (*See* Stratman Dep 445:12–446:8, ECF No. 149-35; Pl.'s Mot. Summ. J. Infringement, Ex. DD, Brenneke Dep. 135:19–136:3, ECF No. 149-33). Accordingly, there is no genuine dispute of material fact regarding this limitation.

[3] As noted below, this ruling does not cover the MHF 7105 model, for which there was insufficient evidentiary support to grant summary judgment.

*KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000)).  That is, spraying liquid across the direct evaporative

section cannot mean the same thing as spraying liquid through the direct evaporative section.

SPX's argument fails because this presumption is "overcome where, as here, the evidence

indicates that the patentee used the [differing] terms interchangeably." *Baran v. Med. Device*

*Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010).  Namely, the specification shows that the

SPX's proposed interpretation is nonsensical in light of the intended operation and function of

the direct evaporative section.[4]  In describing the direct evaporative section, the specification

states, "There are numerous such fill sheets in a heat exchange apparatus, with appropriate

spacing to **allow evaporative liquid to run downwardly across the fill sheets** . . . ." ('782

Patent col. 3 I. 53–56, ECF No. 149-3) (emphasis added). It further states, "Evaporative liquid

**falling downwardly** and exiting direct evaporative section is collected on re-spray tray." *Id.* col.

4 I. 1–2 (emphasis added).  SPX's proposed construction is irreconcilable with the preferred

embodiments of the specification.  "[A] construction that excludes a preferred embodiment 'is

rarely, if ever, correct and would require highly persuasive evidentiary support.'" *Starhome*

*GmbH v. AT & T Mobility LLC*, 743 F.3d 849, 857 (Fed. Cir. 2014) (quoting *Vitronics Corp. v.*

*Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)).  SPX has offered no such evidentiary

support.  The only reasonable interpretation of this limitation is that the evaporative liquid must

---

[4] SPX's reliance on *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304 (Fed Cir. 2004), is misplaced.  They cite the case for the proposition that "the specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal." *Id.* at 1309.  The court, however, does not look to the specification to redefine the term "through."  The plain and ordinary meaning of this term applies.  It is rather the context in which that term is used that concerns the court. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("[T]he context in which a term is used in the asserted claim can be highly instructive.")  The specification provides the context through which the court can ascertain the meaning of the claim limitation as a whole.  *See id.* at 1313 ("Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.").

be sprayed generally downwardly onto or across the fill sheets and then travel through the direct

evaporative section by running downwardly across the fill sheets.

The court next looks to whether the limitation is present in the MH Fluid Cooler.  SPX

concedes that evaporative liquid is sprayed onto the "top of the fill sheets and then flows down

over the surface of the fill sheets by gravity during operation of the MH Fluid Cooler."  (Opp'n

Pl.'s Mot. Summ. J. Infringement 15, ECF No. 156).  The limitation, as construed in this

opinion, clearly applies to the MH Fluid Cooler.

### B. [6] "collecting the evaporative liquid that passes through the direct evaporative section in a respray tray"

SPX also contends the MH Fluid Cooler does not have a "respray tray" as required by the

limitation "collecting the evaporative liquid that passes through the direct evaporative section in

a respray tray."  The court construed the term "respray tray" to mean "a tray located between the

direct and indirect evaporative cooling sections for collecting unevaporated coolant and

redistributing the liquid without the use of a pump."  (Memorandum 3–4, ECF No. 113).  BAC

points to the MH Fluid Cooler's intermediate redistribution basin to show this limitation applies.

The redistribution basin is located between the direct and indirect evaporative sections, collects

unevaporated coolant, and redistributes that liquid without the use of a pump.  The only dispute

is whether the redistribution basin is a "tray."

SPX contends the intermediate redistribution basin is not a tray, arguing that "[a] tray is

flat with a small lip and may not have four walls whereas a basin has deeper sides and has four

walls."  (Opp'n Pl.'s Mot. Summ. J. Infringement 38, ECF No. 156).  BAC points to language in

U.S. Patent No. 7,332,116 ("the '116 patent"), a patent on the MH Fluid Cooler, describing the

redistribution basin as a tray.  SPX disputes the relevance of the '116 patent, arguing the current

MH Fluid Cooler does not practice the '116 patent.  In particular, they note the design of the MH Fluid Cooler was revised shortly after it was first released to remove a "thermal equalizer tray."

SPX's arguments are unavailing.  The '116 patent is relevant in analyzing the MH Fluid Cooler because, as SPX's corporate representative conceded, the '116 patent "is a patent on the MH Fluid Cooler."  (Brenneke Dep. 510:4–6, ECF No. 149-34).  When asked to identify the differences between the '116 patent and the current MH Fluid Cooler, SPX's representative noted that the earlier model's redistribution basin had a top cover, and this top cover was subsequently removed.  *Id.* at 512:3–513:25.  SPX's representative, however, did not identify any other changes to the design or operation of the redistribution basin when asked if there were "any other differences between the MH Fluid Cooler and the device depicted in . . . the '116 patent."  (Brenneke Dep. 513:21–514:2, ECF No. 149-34).[5]  SPX's own expert concedes that the bottom of the redistribution basin, as described in the '116 patent, is in the form of a tray.  (Reply Pl.'s Mot. Summ. J. Infringement, Ex. 8, Wright Dep. 260:7–263:8, ECF No. 183-9).  Accordingly, there is no genuine dispute that this limitation applies to the MH Fluid Cooler.

## C.  [8] "moving air generally downwardly and across the indirect evaporative section"

The final point of contention regarding claim 22 is whether the limitation "moving air generally downwardly and across the indirect evaporative section" applies to the MH Fluid Cooler.  The court construed this limitation to mean "moving air in a generally downward direction and generally cross-current to the flow of evaporative liquid through the indirect evaporative section."  (Memorandum 10, ECF No. 113).  BAC points to SPX's marketing materials, the '116 patent, and computational fluid dynamics ("CFD") models as evidence that the limitation applies.  SPX disputes the relevance of the marketing materials and the '116

---

[5] Nor has counsel identified any relevant difference, aside from removal of the top cover, between the redistribution basin of the current MH Fluid Cooler and that reflected in the '116 patent.

patent, and they claim the CFD models show airflow that is generally co-current rather than generally cross-current, noting that any horizontal flow is through only a small area of the indirect section.

SPX's argument relies on a claim construction already rejected by this court: that generally means primarily.  The limitations do not require air to flow through a certain percentage of the indirect section to be considered "generally" flowing in a particular direction; rather, they simply contemplate something more than a de minimis flow in the specified direction.  Indeed, the court specifically rejected that "generally" means "primarily."  Having rejected a "primarily" interpretation, only two readings of the limitation are feasible.  First, air travels through part of the indirect section in a downward direction and part of the section in a horizontal (cross-current) direction.  Alternatively, air travels downward at a clear angle, exiting the indirect section to the left or right of where it entered.  Both scenarios apply to the MH Fluid Cooler.[6]

As shown below, the CFD models[7] portray air entering the indirect evaporative section of the MH Fluid Cooler from both the top and right side.[8]  The air entering the right side travels in a horizontal direction before sloping downward towards the left side, exiting from the bottom

---

[6] In contrast to its arguments involving limitation number 4 ("spraying an evaporative liquid generally downwardly through the direct evaporative section"), SPX has not even attempted to identify what airflow that is both generally down and generally across would look like under its proposed interpretation.

[7] While SPX contends the CFD models exclude water flow from their calculations, they recognize that the models "more accurately convey the nature and extent of the airflow than generalized marketing documents," and are "a common way of modeling airflow where airflow is difficult to directly measure with accuracy."  (Opp'n Pl.'s Mot. Summ. J. Infringement 35–36, ECF No. 156).  Indeed, the CFD models are the only verifiable evidence presented of airflow through the indirect section.

[8] There are several different models of the MH Fluid Cooler.  Relevant here, each model has a slightly different configuration in the indirect section.  With one exception, air enters the indirect section from the top or the right side.  The indirect section of the MH Fluid Cooler's 700 series models, and for some models in the 7100 series, has a baffle of sheet metal on the inlet side of the coil.  For the 700 and 7100 series, a baffle is also placed on the outlet side.  The baffle sheets only allow air to enter and exit on the portion of each side not covered by sheet metal.

or the bottom portion of the left side.  The air entering through the top travels generally

downward and diagonally towards the left side of the section before exiting the bottom or the

bottom portion of the left side.  The CFD model for the MHF7103 Tall Fill 12 Row Coil

provides a clear example of the MH Fluid Cooler's air flow pattern conforming to this limitation:



(Opp'n Pl.'s Mot. Summ. J. Infringement, Ex. 39, CFD Models at SPX 136274, ECF No. 156-

40)

Even the models of MH Fluid Coolers with minimal airflow entering through the right

side, due to an inlet baffle extending to just below the top of the coil, have sufficient horizontal

and diagonal air movement to consider this limitation applicable.[9]  The CFD model for the

MHF7107 Short Fill 8 Row Coil 10HP serves as a good example:

---

[9] The defendant also notes that "[i]n some instances, such as the MHF 7105 with an 8 row copper coil, the inlet baffle completely blocks air from entering the coil on the side."  (Opp'n Pl.'s Mot. Summ. J. Infringement 33, ECF No. 156).  No CFD models were provided for the MHF 7105, and neither party has presented evidence that would allow a fact-finder to determine the airflow through the indirect section of the MHF 7105.  Accordingly, summary judgment will be denied as to the MHF 7105 with an 8 row coil.



(CFD Models at SPX 136294, ECF No. 156-40).

These CFD models show that no reasonable jury could find the limitation inapplicable to the MH Fluid Cooler.  In each model, air at least travels at a distinct downward diagonal angle. Because the SPX has not introduced any evidence supporting its position beyond conclusory statements disclaiming cross-flow, no genuine dispute of fact exists. *See Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1326 (Fed. Cir. 2002) ("[Expert's] conclusory statement is insufficient to raise a genuine evidentiary dispute for trial.").  Accordingly, BAC is entitled (except as to the MHF 7105 model) to summary judgment of infringement of claim 22.

## II.     BAC's Motion for Summary Judgment of No Invalidity

BAC seeks summary judgment of no invalidity for the '782 patent under 35 U.S.C. § 102(g)(2).[10]  It contends SPX has relied on a single date of purported conception, November 2, 1998, throughout this litigation and should therefore be prohibited from advancing invalidity

---

[10] The Leahy–Smith America Invents Act ("AIA") revised 35 U.S.C. § 102.  The pre-AIA version of the statute applies to the issues in this case.

arguments premised on alternative dates of conception.  BAC further argues that SPX has not identified corroborating evidence of conception because it only offers (1) the testimony of interested witnesses and (2) documents that do not disclose all of the relevant claim limitations of the '782 patent. For the reasons discussed below, a genuine dispute of material fact precludes summary judgment for BAC.

### A. Relevant Law

Section 102(g) provides that "[a] person shall be entitled to a patent unless . . . before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it.  In determining priority of invention under this subsection, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other." 35 U.S.C. § 102(g)(2) (2000).  "Anticipation under § 102 requires 'the presence in a single prior art disclosure of all elements of a claimed invention arranged as in that claim.'"  *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001) (discussing section 102(g) and quoting *Carella v. Starlight Archery & Pro Line Co.*, 804 F.2d 135, 138 (Fed. Cir. 1998)).  SPX may rely on multiple sources to establish conception;[11] however, for an invention to qualify as "prior art" that may anticipate the '782 patent under section 102(g), SPX must also establish a reduction to practice in which the "invention [was] sufficiently tested to demonstrate that it [worked] for its intended purpose." *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1445 (Fed. Cir. 1984).

---

[11] "Conception may be corroborated even if no single piece of evidence shows complete conception. Instead, all of the evidence of record must be collectively evaluated in determining when the invention was conceived." *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1356 (Fed. Cir. 2010) (citations omitted).

Conception is a term of art subject to long-settled federal law:

> The definition of conception in patent law has remained essentially unchanged for more than a century. It is the "'formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.'" *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986) (quoting 1 *Robinson on Patents* 532 (1890)). At that point, "all that remains to be accomplished, in order to perfect the art or instrument, belongs to the department of construction, not creation." 1 *Robinson* 532. Based on that definition, we have held that "[c]onception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation," and that "[a]n idea is definite and permanent when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994). Moreover, "[b]ecause it is a mental act, courts require corroborating evidence of a contemporaneous disclosure that would enable one skilled in the art to make the invention." *Id.*

*Dawson v. Dawson*, 710 F.3d 1347, 1352 (Fed. Cir. 2013).  While SPX will bear the burden at trial of proving both conception and timely reduction to practice by clear and convincing evidence, *see Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1352 (Fed. Cir. 2013), BAC's motion focuses on the issue of conception.[12]  Accordingly, the court addresses only that issue.

## B. Multiple Possible Dates of Conception

The court declines to limit SPX to a November 2, 1998, date of conception.  BAC correctly notes that SPX repeatedly refers to November 2, 1998, as the earliest possible date of conception.  BAC argues SPX should not be allowed to raise other conception dates because it failed to do so in its amended invalidity contentions.  It further challenges the sufficiency of

---

[12] While BAC's reply brief may raise a challenge to SPX's reduction to practice, particularly regarding the use of a blower on its prototypes, those issues were not addressed in BAC's initial motion and will not be considered at this juncture.  *See Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310, 315 (D. Md. 2014) ("Arguments raised for the first time in reply generally should not be considered without affording the opposing party an opportunity to respond.")

SPX's purported corroborative evidence.  BAC also characterizes SPX's position as impermissibly relying on a "time period" because conception occurs at a single moment in time.

As to its first argument, BAC ignores key disclosures made throughout the course of this litigation.  SPX, in responding to BAC's interrogatories, disclosed multiple alternative dates on which the court could find conception had occurred, specifically referencing steps taken in 1999 and 2003 to create a prototype for a commercial fluid cooler purportedly containing all of the asserted claims of the '782 patent  (Opp'n Pl.'s Mot. Summ. J. No Invalidity, Ex. 12, SPX's Second Suppl. Resp. Interrog. 6–7, ECF No. 152-20).  Indeed, even SPX's invalidity contentions state that November 2, 1998, was the *earliest* possible date of conception and specifically reference the March 2003 time period to establish a reduction to practice.[13]  (Opp'n Pl.'s Mot. Summ. J. No Invalidity, Ex. 11, Initial Invalidity Contentions 8–9, ECF No. 152-19).  These disclosures provided BAC with sufficient notice that SPX was not relying solely on the November 2, 1998, date and that any invalidity claims could involve conception on a later date. Further, BAC has not identified any binding precedent requiring SPX to advance a single date of conception.[14]  SPX was not required to name only a single date of conception, and the court declines to create such a requirement.

---

[13] Even without the other disclosures, SPX's reference to early March 2003 put BAC on notice that conception could be established during this time period because "under some conditions conception is delayed until a reduction to practice." *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1064 (2005).  Accordingly, BAC knew or should have known that conception could be claimed after November 2, 1998.

[14] BAC's citation to *Blue Spike, LLC v. Adobe Systems, Inc.*, Civil No. YGR-14-1647, 2015 WL 335842 (N.D. Cal. Jan. 26, 2015), is inapposite.  That case dealt with specific language in a local rule of the Northern District of California not found in the local rules of the District of Maryland. Further, while conception occurs at a single legally operative moment in time, the inventive process necessarily unfolds over a longer period leading up to that moment.  BAC's citations to *Oka v. Youssefyeh*, 849 F.2d 581 (Fed. Cir. 1988), and *Amkor Tech, Inc. v. Int'l Trade Comm'n*, 692 F.3d 1250 (Fed. Cir. 2012), are also inapposite.  Those cases involved testimony that merely placed acts within a stated time period.  In contrast, SPX has identified specific documents created on specific dates. That these were framed within a larger discussion of the inventive process does not preclude a finding of conception on a specific date.

### C. Conception Containing the Limitation "moving air generally downwardly and across the indirect evaporative section"

The parties' remaining arguments focus on the sufficiency of SPX's corroborative evidence, primarily as it pertains to a November 2, 1998, conception.  BAC contends that none of the non-testimonial evidence (e.g. Mr. Stratman's notebook and November 2, 1998, memorandum) reveals a conception encompassing all of the claimed limitations of the '782 patent.  *See Singh v. Brake*, 317 F.3d 1334, 1340 (Fed. Cir. 2003) ("A conception must encompass all limitations of the claimed invention . . . .").  The court agrees with BAC's position regarding the 1998 notebook and memorandum.  Neither reveal a conception encompassing the step of "moving air generally downwardly and across the indirect evaporative section," a limitation required by claims 22, 23 and 26 of the '782 patent.  As previously noted, the court construed this limitation to mean "moving air in a generally downward direction and generally cross-current to the flow of evaporative liquid through the indirect evaporative section." (Memorandum 10, ECF No. 113).  The diagrams on which SPX relies show baffle sheets completely covering the left and right sides of the indirect section:

 

(Pl's. Mot. Summ. J. No Invalidity, Ex. E, Stratman Notebook at SPX 005881, ECF No. 147-7; Ex. F, Memorandum Dated Nov. 2, 1998 at SPX 000847, ECF No. 147-8).  These diagrams suggest Mr. Stratman did not conceive of a general cross-current flow through the indirect section.  The notebook excerpt accompanying these drawings makes no reference to cross-current airflow: "The air flows downward through the coil bundle and exits at the coil bottom. . . . The air flow is co-current with the spray flow and parallel with the water flowing through the coil bundle."  (Stratman Notebook at SPX 005883, ECF No. 147-7). Even Mr. Yang, whose CFD models SPX relies on elsewhere in this litigation, offered a similar characterization of airflow through a coil section when both sides are blocked.  (Pl's. Mot. Summ. J. No Invalidity, Ex. N, Yang Dep. 89:13–20, ECF No. 147-16).

SPX contends the 1998 drawings reflect cross-current airflow under the "broad" definition of "generally across" advanced by BAC in its infringement motion.  That is, SPX contends any amount of cross-current flow encompasses the limitation as interpreted by BAC. To accept that air entering only through the top and exiting only through the bottom of the indirect section could be construed as "generally cross-current" would render the limitation meaningless.[15]  This is not the construction the court adopted in its *Markman* order, nor does it follow from the court's analysis of BAC's infringement motion.  SPX relies only on attorney argument and conclusory assertions that airflow would be cross-current.  The 1998 documents do not alone establish a conception encompassing all of the claimed limitations of the '782 patent.

---

[15] For the same reasons, SPX cannot rely on the figures in the March 11, 1999 memorandum.

In contrast to the 1998 evidence, SPX has pointed to specific documents from 2003 that establish a genuine dispute of fact appropriate for resolution at trial.  In particular, they identify instructions from February 2003 for building a cooler prototype with different coil configurations.[16]  One of these configurations has baffle sheets that do *not* completely block both sides of the indirect section:



(Opp'n Pl's. Mot. Summ. J. No Invalidity, Ex. 41, Test Matrix at SPX000322, ECF No. 152-49). As discussed above, when airflow enters an indirect section through the top and the side, as contemplated by the diagram above, it may travel a measurable distance horizontally before moving downward and out the bottom or other side of the indirect section.  At a minimum, the February 2003 instructions and drawing are sufficient to create a genuine dispute over whether Mr. Stratman and others conceived of a cooler containing the limitation "moving air generally downwardly and across the indirect evaporative section."

[16] BAC argues these instructions should not be considered because they are dated February 30, 2003. This is clearly a typographical error.  SPX produced other documents from early February 2003 that were created in response to the instructions.  (*See, e.g.*, Opp'n Pl's. Mot. Summ. J. No Invalidity, Ex. 38, Kauffman Notes at SPX009752—55, ECF No. 152-46).  A reasonable fact-finder could only conclude that these instructions were created in early February of 2003.  Further, that the instructions use the future tense does not indicate a lack of certainty over the ideas expressed therein; indeed, one would expect instructions for how to build a device to be written in either the future tense or imperative form.

#### D.  Other Limitations

BAC has not identified other limitations missing from SPX's purported conception; it offers only generalized and conclusory assertions that the device described in the 2003 instructions would not encompass all of the claimed limitations of the '782 patent.  While SPX will ultimately bear the burden of proof in establishing invalidity, at this stage, it only need address BAC's specific contentions.  BAC cannot rely on conclusory assertions in its summary judgment motion; it must identify the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any'" that reveal an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Exigent Tech., Inc. v. Atrana Sols., Inc.*, 442 F.3d 1301, 1308–09 (Fed. Cir. 2006) (requiring, in the filing of a summary judgment motion, a statement "that the patentee had no evidence of infringement and *pointing to the specific ways* in which accused systems did not meet the claim limitations").  SPX has satisfactorily addressed the only limitation specifically raised by BAC; accordingly, BAC is not entitled to summary judgment.

### III.    SPX's Motion for Summary Judgment of Non-infringement

SPX moves for summary judgment on three issues: First, that SPX does not infringe claims 16, 17, 18, 21, 22, 23, or 26 of the '782 patent because the MH Fluid Cooler does not perform the step of "spraying water generally downwardly through the direct evaporative section";  second, that BAC cannot demonstrate an invention date prior to July 12, 2004 for claims 22, 23, and 26; and third, that SPX does not infringe claims 16, 17, 18, or 21 of the '782 patent "because air does not flow in a generally upward direction through the direct evaporative section of the Marley MH Fluid Cooler."  (Mem. Supp. Defs.' Mot. Summ. J. Non-Infringement

1, ECF No. 133-1).  For the reasons discussed below, SPX's motion will be granted in part and denied in part.

### A.  Non-Infringement of Claims 16, 17, 18, 21, 22, 23, or 26 of the '782 Patent

The court's analysis of BAC's motion for summary judgment of infringement establishes that the MH Fluid Cooler performs the step of spraying water generally downwardly through the direct evaporative section.  Accordingly, SPX's motion for summary judgment of non-infringement of claims 16, 17, 18, 21, 22, 23, or 26 of the '782 patent will be denied.

### B.  Invention Date for Claims 22, 23, and 26 of the '782 Patent

SPX seeks summary judgment setting BAC's invention date for claims 22, 23, and 26 of the '782 patent as July 12, 2004 (the application date of the '782 patent).  SPX ultimately will bear the burden of proof if they seek to establish invalidity via prior conception.[17]  To avoid summary judgment on the issue of its own conception date, however, BAC must identify some evidence that would allow a jury to conclude it envisioned a device containing all of the relevant limitations at a date earlier than July 12, 2004.  In particular, BAC must address SPX's contention that it lacks evidence to corroborate consideration of cross-flow through the direct section prior to the inclusion of that limitation in the '782 patent application.

In August 2002, BAC began developing a new line of induced draft evaporative condensers.  These efforts were known as the IDC program.  (Opp'n Defs.' Mot. Summ. J. Non-

---

[17] Since the court has concluded there is a genuine dispute of fact as to whether SPX conceived of an invention containing the limitations of claims 22, 23 and 26 of the '782 patent sometime in February and March of 2003, and since these dates precede the application filing date for the '782 patent, SPX has presented evidence capable of establishing a *prima facie* case of invalidity under section 102(g).  BAC now has the burden of producing or identifying evidence that could prevent a reasonable jury from concluding SPX established prior conception by clear and convincing evidence. While the burden of production shifts to BAC, SPX retains the burden of persuasion on this point.  *See Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008) ("Neither [the patentee's] burden to prove infringement nor [the accused infringer's] burden to prove invalidity, both ultimate burdens of persuasion, ever shifts to the other party—the risk of decisional uncertainty stays on the proponent of the proposition.")

Infringement, Ex. 6, IDC Objectives and Results Memorandum, ECF No. 163-7).  Key to these

efforts was Thomas Carter, the named inventor of the '782 patent.  (Opp'n Defs.' Mot. Summ. J.

Non-Infringement, Ex. 23, Carter Decl. ¶1, ECF No. 163-28).  The early IDC designs

contemplated using counterflow fill in the direct section.  *Id.* ¶ 20.  BAC already had a model on

the market that used crossflow fill.  *Id.* ¶ 35.  In the process of designing a new unit, BAC

calculated the amount of counterflow fill necessary to replace crossflow fill.  (Opp'n Defs.' Mot.

Summ. J. Non-Infringement, Ex. 8, IDC Evaluation at BAC_041186, ECF No. 163-9).  From

December of 2002 until March of 2003, BAC developed an IDC prototype using counterflow

fill.  (Carter Decl. ¶¶ 17, 22, ECF No. 163-28).  It was the prototype using counterflow fill to

which Mr. Carter decided to add a respray tray on March 17, 2003.  *Id.* ¶¶ 24–28. For the next

several months, BAC continued work on the IDC counterflow prototype.  *Id.* ¶ 29.  BAC

abandoned the IDC project in August of 2003.  *Id.* ¶ 37.  On July 12, 2014, BAC filed the

application for the '782 patent, including an embodiment which called for cross-flow airflow

through the direct section.

BAC contends the conception date for claims 22, 23 and 26 was as early as March 17,

2003, the date on which Mr. Carter contemplated adding a respray tray to his invention.  While

BAC concedes the respray tray was added only to a counter-flow prototype, it argues for a

March 17, 2003, conception date for the claims requiring cross-flow because BAC had other

models on the market with cross-flow fill arrangements and had specifically contemplated the

relationship between counter-flow and cross-flow fill when engineering the IDC prototype.  SPX

contends that Mr. Carter's own testimony shows he had not conceived of a device containing

both cross-flow fill and all of the other limitations of claims 22, 23 and 26 on March 17, 2003,

and that the only documentary evidence identified by BAC predates the March 17, 2003, decision to add a respray tray—a required limitation—to the cooler.

The evidence offered by BAC merely shows that Mr. Carter and the team working on the IDC prototype were familiar with cross-flow fill; it does not, as BAC contends, show they conceived of—that is, reached "a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice"—a cooler in which air flowed generally across the direct section along with all other limitations of claims 22, 23 and 26 in March of 2003.  In his deposition testimony, Mr. Carter conceded that BAC was not using a cross-flow arrangement when Mr. Carter added the respray tray, a necessary limitation.  (Pl.'s Mot. Summ. J. No Invalidity, Ex. J, Carter Dep. 113:3–19, ECF No. 147-12).  He contends the team working on the IDC prototype was familiar with the ability to switch out fill arrangements and that, at the time he added the respray tray and conceived of the invention, "it would have been consistent with us to envision all types of . . . fill arrangements."  *Id.* at 117:1–12.  He also asserted, however, that there "would have been a written document" showing the first time someone wrote down that his new design with a respray tray could be used with a crossflow fill arrangement.  *Id.* at 117:13–17.  No such document has been produced.

BAC's proffered evidence does not corroborate conception.  BAC has not identified any document, beyond the '782 patent application itself, showing that Mr. Carter or another member of the IDC team had a definite and permanent idea of using cross-flow fill in a device with a respray tray and all of the other limitations of claims 22, 23, and 26.  Instead, the documentary evidence only shows that the inventors were aware that cross-flow fill was commonly used in fluid coolers.  To corroborate conception, more is required than showing an idea would or should have been obvious to the inventor.  "For conception, [the court] look[s] not to whether one

skilled in the art could have thought of the invention, but whether the alleged inventors actually had in their minds the required definite and permanent idea." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1232 (Fed. Cir. 1994).  Absent corroboration, Mr. Carter's self-serving testimony[18] is insufficient to create a genuine dispute of fact.  BAC's invention date for claims 22, 23, and 26 is therefore July 12, 2014, the application date of the '782 patent.  SPX's motion for partial summary judgment on BAC's invention date will be granted.

### C.  Non-Infringement of Claims 16, 17, 18 and 21 of the '782 Patent

SPX seeks summary judgment of non-infringement of claims 16, 17, 18 and 21 of the '782 patent because the MH Fluid Cooler does not perform the limitation of "moving air generally upwardly through the direct evaporative section," which the court construed to mean "moving air in a generally upward direction through the direct evaporative section." (Memorandum 7, ECF No. 113).  This motion will be denied.  There is, at minimum, a genuine dispute as to whether airflow in the direct section of the MH Fluid Coolers travels in a generally upward direction.

SPX argues that any upward flow is incidental to the crossflow of air through the direct section and cannot reasonably be considered to be moving in a "generally upward direction." They challenge BAC's evidence: namely, marketing documents for the MH Fluid Cooler, a figure from the '116 patent, and tests conducted by Mr. Welch on a modified MH Fluid Cooler. SPX disputes the relevance or accuracy of each.

SPX does not dispute, however, that air exits the MH Fluid Cooler at an angle of approximately 45 degrees as a result of passing through mist eliminators.  (Mem. Supp. Defs.'

---

[18] In his declaration, Mr. Carter offers only the conclusory statement that "the inventions I conceived of would have worked equally well with counterflow or crossflow fill.  I was aware of the relationship between crossflow and counterflow fill in March 2003 and, at that time, I knew that my inventions could employ either type of fill." (Carter Decl. ¶ 40, ECF No. 163-28)

Mot. Summ. J. Non-Infringement 47, ECF No. 133-1).   SPX contends BAC can at best show that

air exits "the last few inches" of the fill sheet at a 45 degree angle, which does not necessarily

reflect "the overall direction of air travel through the direct evaporative section."   *Id.*   This fact,

however, is fatal to SPX's request for summary judgment.   To rule for SPX, the court would

have to find that either (a) a 45 degree angle does not reflect airflow that is "generally upward"

or (2) the upward airflow does not traverse enough of the indirect section to constitute flowing

through it.   Neither position is tenable.   SPX  "would not dispute that air moving through the

direct section at an angle, like 45 degrees above the horizontal, could be considered both

generally upward and generally across." (Reply Defs.' Mot. Summ. J. Non-Infringement 16,

ECF No. 174).[19]   Additionally, the court has already ruled that for air to flow "generally

upwardly through the direct evaporative section," it need not move throughout the entire section.

(Memorandum 8, ECF No. 113).

　　　SPX also points out that airflow through most of the direct section is across rather than

up, and that air actually enters the direct section at a downward angle.   That the air starts at a

downward angle does not preclude a reasonable jury from finding that the airflow is generally

upward in light of the height and angle at which it exits the direct section.[20]   That airflow may

also move generally across a majority of the section does not preclude application of this

---

[19] To the extent SPX contends the only upward airflow is incidental to the cross-flow and therefore does not satisfy this limitation, the court rejects that argument.   A 45 degree angle cannot reasonably be considered incidental.

[20] SPX has not offered any evidence to show that air exits the direct section at the same height as or lower than where it entered.   BAC's expert's analysis seems to suggest the opposite, (Opp'n Defs.' Mot. Summ. J. Non-Infringement, Ex. 22, Welch Decl. ¶¶ 200–209, ECF No. 163-27), and a reasonable jury could accept these findings as correct.

limitation.[21]   Accordingly, SPX's motion for partial summary judgment of non-infringement of

claims 16, 17, 18 and 21 of the '782 Patent will be denied.

### IV.      Motion to Exclude the Opinions of James D. Wright

BAC moves to exclude the opinions of SPX's expert witness, James D. Wright, pursuant

to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals,*

*Inc.*, 509 U.S. 579 (1993).  Rule 702, which governs the admissibility of expert testimony, states:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable principles
> and methods; and (d) the expert has reliably applied the principles and methods to
> the facts of the case.

The party seeking to introduce expert testimony has the burden of establishing its

admissibility by a preponderance of the evidence.  *Daubert v. Merrell Dow Pharm.,* 509 U.S.

579, 592 n. 10 (1993).  A district court is afforded "great deference . . . to admit or exclude

expert testimony under *Daubert." TFWS, Inc. v. Schaefer,* 325 F.3d 234, 240 (4th Cir.

2003) (citations and internal quotation marks omitted); *see also Daubert,* 509 U.S. at 592–

95 ("The inquiry envisioned by Rule 702 is . . . a flexible one . . . .").  "In applying *Daubert,* a

court evaluates the methodology or reasoning that the proffered scientific or technical expert

uses to reach his conclusion; the court does not evaluate the conclusion itself," *Schaefer,* 325

F.3d at 240, although "conclusions and methodology are not entirely distinct from one

another." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).  In essence, the court acts as

---

[21] As noted in the *Markman* memorandum, "the intrinsic record suggests that, in fact, embodiments can simultaneously 'mov[e] air generally upwardly through' and 'mov[e] air generally across' a section." (Memorandum 9 n.6, ECF No. 113).  Further, the court did not construe "generally" to imply a "majority" requirement.

gatekeeper, only admitting expert testimony where the underlying methodology satisfies a two-pronged test for (1) reliability and (2) relevance. *See Daubert,* 509 U.S. at 589.

BAC contends Mr. Wright's opinions fail to satisfy *Daubert* and all four requirements of Rule 702 because he (1) analyzed issues using claim construction positions already rejected by the court; [22] (2) used flawed methodology to perform his own claim construction analysis; and (3) admitted his lack of expertise. The evidence identified by BAC does not compel the exclusion of Mr. Wright's opinions. The isolated discrepancies in Mr. Wright's testimony do not indicate to the court that his methods, or the facts on which they are based, are flawed. In contrast to the out-of-context excerpts cited by BAC, Mr. Wright's reports show he has clear knowledge of how the court construed the claims of the '782 patent.[23] The court does not read Mr. Wright's testimony or opinions as suggesting he would offer an improper claim construction argument in front of the jury.

In any event, in ruling on the parties' dispositive pre-trial motions, the court has determined that the MH Fluid Cooler performs the claim limitations of "moving air generally downwardly across the indirect section," "spraying an evaporative liquid generally downwardly through the direct evaporative section," and "collecting the evaporative liquid that passes through the direct evaporative section in a respray tray." Accordingly, BAC's challenges to Mr. Wright's opinions on these matters are moot. To the extent SPX relies on Mr. Wright's opinions regarding other limitations, BAC may challenge his conclusions through cross-examination. *See Daubert,* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and

---

[22] In particular, BAC takes issue with his interpretation of the words "across," "cross-current," "through," and "tray."

[23] Read in conjunction with the remainder of his testimony and reports, the portions of the record cited by BAC reflect that Mr. Wright indeed understood the court's claim constructions and he was attempting to offer nuanced responses that would further his client's position. Offering testimony that advances the positions taken by a client does not render that testimony unreliable.

careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")[24]  And if he were asked to construe claim language already decided by the court, BAC's counsel may raise an objection at that time.  His opinions, however, currently satisfy the requirements of Rule 702 and *Daubert*.

## V.      Motion to Exclude Opinions of Welch

SPX moves to exclude portions of the opinions of BAC's expert witness, Jeffery K. Welch, pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 570 (1993).  SPX identifies four portions of Mr. Welch's reports and testimony it wishes to exclude.  For the reasons provided below, SPX's motion will be granted in part and denied in part.

### (1) Prior Art References

SPX seek to exclude a portion of Mr. Welch's opinion regarding obviousness.  Namely, it challenges his opinion that SPX's failure to cite certain prior art during the prosecution of its own patents shows that a person with ordinary skill in the art would not have thought to combine those prior art references.  Mr. Welch's opinion regarding SPX's failure to disclose prior art references will be excluded from trial.

BAC has not established the relevance of this opinion.  The pertinent obviousness inquiry is whether a person with ordinary skill in the art would have thought of combining two or more references (or modifying a single reference) to achieve the patented method.  *See Shire LLC v. Amneal Pharm., LLC*, 802 F.3d 1301, 1306 (Fed. Cir. 2015).  For SPX's conduct in the prosecution of its patent to be relevant, Mr. Welch must first establish that SPX knew of the

---

[24] BAC also contends Mr. Wright's opinions should be excluded because he admitted lacking the requisite expertise.  This mischaracterizes Mr. Wright's testimony.  He stated he was not a legal expert and could not offer the legal conclusion required by BAC's counsel's questions.  This truthful assertion is certainly not grounds to find his opinions unreliable.

disputed prior art references and was under an obligation to disclose those references to the

patent office.  While the evidence suggests SPX had an awareness of at least some of these

references, (Pl.'s Opp'n Defs.' Mot. Exclude Welch 3–4, ECF No. 164), BAC has not rebutted

SPX's contention that it was not obligated to present the prior art references to the patent office

(e.g. because they were duplicative of prior disclosures).  Absent that obligation, SPX's conduct

in the prosecution of its patent has no bearing on whether a person with ordinary skill in the art

would think to combine those prior art references.[25]  Accordingly, this portion of Mr. Welch's

opinion and any potential testimony deriving therefrom shall be excluded.

### (2)  BAC's Date of Conception

Having decided that BAC is not entitled to an invention date earlier than July 12, 2014,

SPX's motion to exclude related portions of Mr. Welch's testimony will be denied as moot.

### (3)  Mr. Welch's Opinions Regarding Moving Air Generally Cross-Current and Generally Upward

SPX contend Mr. Welch has not offered sufficient support for his assertions regarding

cross-current and generally upward airflow.  SPX, rather than identifying grounds for excluding

Mr. Welch's opinions, rehash claim construction arguments.  A *Daubert* motion is not the

appropriate vehicle for those challenges.  SPX's disagreement with Mr. Welch's conclusions

does not make his testimony inadmissible; they may challenge his reasoning and conclusions

through cross-examination.

### (4) Secondary Considerations of Obviousness

**Commercial Success**: Nothing identified in SPX's motion suggests Mr. Welch should be

excluded from testifying as to the MH Fluid Cooler's commercial success.  To rely on the

accused product's commercial success as evidence of nonobviousness, "[a] nexus between

---

[25] In contrast to the law applied to patent prosecutions, which governs SPX's obligation of disclosure to the patent office, knowledge of all pertinent prior art is presumed when evaluating obviousness.

commercial success and the claimed features is required.  However, if the marketed product

embodies the claimed features, and is coextensive with them, then a nexus is presumed and the

burden shifts to the party asserting obviousness to present evidence to rebut the presumed nexus.

The presumed nexus cannot be rebutted with mere argument; evidence must also be put forth."

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000)

(citations omitted).

Mr. Welch opines based on objective facts in the record that the MH Fluid Cooler

embodies the '782 patent and is coextensive with its claims.  BAC has not identified a

methodological flaw that would render his testimony on this point unreliable.  While Mr. Welch

may not offer conclusory assertions that the MH Fluid Cooler is commercially successful

because it practices the '782 patent's claims, he will be permitted to testify to underlying facts

and opinions that could allow a jury to reach that conclusion.  These contested issues of fact are

not appropriate for resolution under a *Daubert* and Rule 702 motion.

**Industry Praise:** Industry praise of the accused product may also serve as a secondary

indicator of nonobviousness. *See, e.g.*, *Apple Inc. v. Int'l Trade Comm'n*, 725 F.3d 1356, 1366

(Fed. Cir. 2013).  SPX only makes conclusory assertions that Mr. Welch's testimony regarding

industry praise is unreliable or irrelevant.  Its main contention is that the praise Mr. Welch

cites—praise by representatives of SPX—does not constitute industry praise evincing

nonobviousness.  SPX does not dispute that these statements were made, nor has it pointed to

any law requiring industry praise to be made by someone unrelated to the alleged infringer.[26]

Though it disagrees with Mr. Welch's conclusion, SPX has not identified any flaws in the facts,

methodology, or legal reasoning underlying his opinion that would merit exclusion under Rule

702 or *Daubert*.

---

[26] Of course, a fact-finder may conclude that such testimony is not persuasive.

**Failure of Others:**  A long felt need in the relevant field and the failure of others to address that need may serve as evidence of nonobviousness.  *See In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006).  SPX takes issue with Mr. Welch's framing of the long felt need purportedly addressed by the '782 patent, as well as his conclusions drawn therefrom.  Beyond a cursory assertion that Mr. Welch does not apply the correct legal standard, SPX has only identified disputes that are appropriate for resolution by a fact-finder or perhaps through summary judgment.  Nothing identified by SPX suggests Mr. Welch's testimony as to failure of others and long felt need is so unreliable or irrelevant as to warrant exclusion under Rule 702 or *Daubert*.

## VI.      SPX's Motion to Strike Expert Opinion Regarding the Doctrine of Equivalents

SPX moves to strike the portion of Mr. Welch's expert report regarding infringement under the doctrine of equivalents.  SPX seeks to exclude BAC from advancing a doctrine of equivalents argument because BAC did not timely or adequately disclose its intent to rely on this infringement theory as required by the local patent rules.  BAC responds that it did comply with the local rules and that any delay was justified in light of SPX's purportedly belated noninfringement contentions.  For the reasons that follow, SPX's motion will be granted.

### A.  Legal Standard: Local Patent Rules

Local Rule 804.1(a) requires any party claiming infringement to file an initial disclosure of infringement contentions within 30 days from the date of the scheduling order.  As part of these disclosure requirements, Rule 804.1(a)(v) requires the party alleging infringement to state "[w]hether each limitation of each asserted claim is alleged to be literally present or present under the doctrine of equivalents in the Accused Instrumentality."  Finally, Rule 804.6 provides that "[a] party may amend [its] Contentions . . . upon written consent of all parties or, for good cause shown, upon leave of the Court."

### B.  Background

To resolve whether BAC's disclosure was timely and adequate under Rule 804, the court looks to three documents offered by BAC: (1) Initial Disclosure of Infringement Contentions, dated September 8, 2014; (2) Amended Disclosure of Infringement Contentions, dated December 23, 2014; and (3) Expert Report of Jeffrey K. Welch Regarding Infringement, November 12, 2015.  (Mot. Strike Doctrine of Equivalents, Ex. 1, Initial Disclosure of Infringement Contentions, ECF No. 120-3; Ex. 2, Amended Disclosure of Infringement Contentions, ECF No. 120-4, Ex. 4, Welch Expert Report, ECF No. 120-6).

BAC's initial disclosure included the following language regarding the doctrine of equivalents:

> BAC asserts that each and every claim limitation of the Asserted Claims of the '782 patent is literally present in the Accused Instrumentalities, as set forth in the claim charts attached hereto as Exhibit 1. For any limitation that is found to be not literally present, and/or in light of Defendants' claim construction positions or the Court's claim construction ruling(s), BAC reserves the right to amend these disclosures to assert that each such limitation is present under the doctrine of equivalents.

(Initial Disclosure of Infringement Contentions 6, ECF No. 120-3).  The amended disclosure included a paragraph containing virtually identical language.  (Amended Disclosure of Infringement Contentions 7, ECF No. 120-4).  As exhibits to both the initial and amended disclosures, BAC attached claim charts, each of which were preceded by the following statement: "Further, the Accused Instrumentalities infringe the claims of the '782 Patent literally and, to the extent not literally, under the doctrine of equivalents."  *Id.*

## C.  Analysis

Neither BAC's initial or amended infringement contentions properly advance a theory of infringement under the doctrine of equivalents.  Even assuming the language in BAC's claim charts does not contradict the language of its actual infringement contentions, these general assertions regarding the doctrine of equivalents do not satisfy the requirements of the Local

Rules.  Rule 804.1(a)(v) requires disclosure of "[w]hether *each limitation* of *each asserted claim* is alleged to be literally present or present under the doctrine of equivalents."  Local Rule 804.1 (D. Md. 2016) (emphasis added).  Simply put, to offer a theory of infringement under the doctrine of equivalents, Rule 804.1 requires the infringement contentions to specifically analyze each individual claim limitation under the doctrine of equivalents.

Other courts have reached the same conclusion when confronted with local rules containing identical language regarding the doctrine of equivalents.  *See, e.g., CSR Tech. Inc. v. Freescale Semiconductor*, No. C-12-02619 RS (JSC), 2013 WL 503077, at *8 (N.D. Cal. Feb. 8, 2013) (citing cases); *see also ASUS Comput. Int'l v. Round Rock Research, LLC*, No. 12-CV-02099 JST (NC), 2014 WL 1463609, at *3 (N.D. Cal. Apr. 11, 2014) ("It is not sufficient in our District to simply disclose whether [the patentee] will assert a theory of infringement under the doctrine of equivalents . . . . Rather, in infringement contentions, a party looking to rely on equivalents still has to *describe how* [the function/way/result] requirements are met." (citations and internal quotation marks omitted)).  The same reasoning applies in this district.  The local rules "are designed to require the parties to crystallize their theories of the case early in the litigation so as to prevent the shifting sands approach to legal argument."  *Changzhou Kaidi Elec. Co. v. Okin Am., Inc.*, 112 F. Supp. 3d 330, 332 (D. Md. 2015) (internal quotation marks omitted) (quoting *Paice LLC v. Hyundai Motor Corp.*, Civil No. WDQ–12–499, 2014 WL 3725652, at *3 (D. Md. July 24, 2014)).  Both the intent and plain language of the local rules show that specificity is required as to each limitation of each claim; place-holder boilerplate language will not suffice.  Allowing BAC to offer specific opinions under the doctrine of equivalents theory after it disclosed only its general belief that all claims were infringed under

the doctrine (and that it *might* at some point amend its disclosures to properly plead the theory) would unfairly disadvantage SPX by subjecting it to a "shifting sands approach" to litigation.

BAC, in the alternative, argues that it reserved the right to amend its disclosures and did so through its expert report. This argument also fails. First, BAC could not reserve a "right" to amend its infringement contentions. The local rules provide that the party alleging infringement may only amend its contentions "upon written consent of all parties or, for good cause shown, upon leave of the Court." Local Rule 804.6 (D. Md. 2016). This court, faced with a similar scenario, rejected a defendant's attempts to offer specific invalidity contentions through an expert report after its initial invalidity disclosures failed to provide the level of specificity required by the local rules. *See Changzhou Kaidi*, 112 F. Supp. 3d at 334. Here, as in *Changzhou Kaidi*, "the local rules do not permit a party to claim the measure of discretion that [BAC] purports to reserve for itself here . . . . To hold otherwise would permit the sort of shifting sands approach to patent litigation the local rules seek to prevent." *Id.* at 334–35 (internal quotation marks and citation omitted).

Although it never sought permission to amend its infringement contentions, BAC claims it was justified in offering a doctrine of equivalents analysis through its expert because SPX amended its noninfringement arguments at the end of fact discovery. This does not excuse BAC's failure to adhere to the local rules. BAC has pointed to no authority, and the court is aware of none, that supports allowing a plaintiff to offer new infringement theories as a matter of right simply because the alleged infringer amended its defenses in light of the court's claim construction order. The local rules, in requiring the party alleging infringement to provide its contentions early in the litigation process, recognize that infringement allegations are not premised on SPX's putative response to those allegations; rather, they are premised on the

31

accused product, the relevant patent, and the court's construction of the terms in that patent.

BAC has not identified any newly discovered evidence that would warrant its late disclosure. [27]

It simply offers a new opinion regarding the doctrine of equivalents in violation of the local

rules.  This BAC may not do.

### D.  Appropriate Sanction

The local rules do not specify the appropriate sanction for a party's noncompliance with

their disclosure requirements. As the Federal Circuit has observed, however, local patent rules

"are essentially a series of case management orders. . . .  The court may impose any 'just'

sanction for the failure to obey a scheduling order, including 'refusing to allow the disobedient

party to support or oppose designated claims or defenses, or prohibiting that party from

introducing designated matters in evidence.' " *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,

467 F.3d 1355, 1363 (Fed. Cir. 2006) (quoting Fed. R. Civ. P. 16(f), 37(b)(2)(B)).  Other courts

have (at least implicitly) analogized the local patent rules to the disclosure requirements

contained in Federal Rule of Civil Procedure 26(a), observing that failure to comply with such a

requirement precludes reliance on non-disclosed materials pursuant to a Rule 37 analysis.  *See,*

*e.g., Tyco Healthcare Grp. LP v. Applied Med. Resources Corp.*, Civil No. 9:06–151, 2009 WL

5842062, at *2 (E.D. Tex. Mar. 30, 2009) (observing that a party's failure to comply with the

local patent rules on disclosure, "unless substantially justified or harmless, [often] means the

evidence will be excluded").  Whether Local Rule 804.1 is more like a scheduling order or more

like a Rule 26 disclosure requirement, however, does not affect the resolution of this motion, for

the consequence for noncompliance is frequently the same: "the exclusion of evidence is often an

appropriate sanction for" violating the local patent rules. *O2 Micro,* 467 F.3d at 1369.

---

[27] If BAC believed SPX to have acted improperly in supplementing its noninfringement defenses in light of the court's *Markman* order, it could have filed a motion to that effect.  It did not.

As discussed above, BAC provides no legally cognizable justification for its new opinion on the doctrine of equivalents.  Allowing BAC to advance this position after the close of fact discovery would significantly prejudice SPX.  By not following the local rules, BAC deprived SPX of the opportunity to conduct meaningful discovery on this new theory of infringement. That SPX happened to have included a few references to the doctrine of equivalents in its discovery requests does not excuse the blatant failure of BAC to timely advance an infringement theory.  Nor does the fact that SPX's expert responded to this portion of Mr. Welch's report suggest the SPX was not prejudiced.  *See Changzhou Kaidi*, 112 F. Supp. 3d at 336–37 ("That Okin's expert could cobble together a rebuttal does not bear on the cogency of that response. Indeed, by the time Kaidi served Howard's report, fact discovery was closed, precluding Okin from developing whatever factual support it might have needed to undermine Kaidi's theories more convincingly.").  Reopening discovery to allow SPX to adequately respond to these new infringement contentions would cause undue delay in a case that is quickly approaching its trial date.  For these reasons, exclusion is the appropriate sanction.[28]  BAC will not be allowed to advance a doctrine of the equivalents infringement theory, and any portions of Mr. Welch's expert report opining on the doctrine of equivalents will be excluded from consideration. [29]

### VII.    BAC's Motion to Strike Late-Produced Documents

---

[28] Application of the Fourth Circuit's standards for sanctions under Federal Rule of Civil Procedure 37(c)(1) would generate the same result. That standard probably does not apply, insofar as the Federal Circuit has held that its law, not the law of the regional circuit, governs analogous local patent rules. *See O2 Micro,* 467 F.3d at 1364–65; *Changzhou Kaidi*, 112 F. Supp. 3d at 338.

[29] The court also rejects BAC's attempts to frame this as an untimely challenge.  SPX's timeliness is simply not an issue here. They were operating under the reasonable assumption that BAC was not proceeding with a doctrine of equivalents infringement theory.  It was only after Mr. Welch offered his expert report providing this new theory of infringement that the sufficiency of BAC's initial disclosures became relevant.

BAC moves to strike six documents, and SPX's reliance thereon, pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure.[30]  Specifically, BAC asks the court to strike the documents bates labeled SPX 138149, SPX 138152, SPX 138163–64, SPX 138469, SPX 138470, and SPX 134871.  For the reasons that follow, BAC's request will be granted as to the document bates labeled SPX 138163-64, denied as moot as to SPX 138470, and denied as to SPX 138149, SPX 138152, SPX 138469, and SPX 134871.

### A.  Legal Standard

Federal Rule of Civil Procedure 26(e)(1) provides that a party has a duty to supplement its initial disclosures and answers to interrogatories when those previous disclosures are incorrect or incomplete.  A party's duty to supplement its initial disclosures with additional information is discharged if the information has "otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).

When a party "fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Excluding evidence as a sanction for non-disclosure, even in the absence of bad faith, supports what the Fourth Circuit has identified as the "basic purpose" of Rule 37(c)(1), which is to prevent surprise and prejudice to the opposing party. *Southern States Rack & Fixture, Inc. v. Sherwin–Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003). "[I]n

---

[30] As an initial matter, the court notes that the parties disagree whether fact discovery in this case ended on October 13, 2015 or October 16, 2015.  The court is of the view that the parties' written correspondence established an October 16, 2015 end date for all purposes relevant to this motion, (Opp'n Mot. Strike Documents, Ex. 2, Email Dated October 8, 2015, ECF No. 158-2; Ex. 3, Email Dated October 9, 2015, ECF No. 158-3); however, whether discovery closed on October 13 or October 16 does not affect the court's analysis or disposition of this motion.

exercising its broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis, a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Id.* at 597.

## B. Analysis

### a. SPX 138163–64: Design-Around Alternatives

On October 15, 2015, SPX produced SPX 138163–64, which lays out four proposed design-around alternatives for the MH Fluid Cooler. (Mot. Strike Documents, Ex. 3, SPX 138163–64, ECF No. 141-3; Ex. 9, Email Dated Oct. 15, 2015, ECF No. 141-9). This was the first time SPX provided BAC with any documents specifying design-around alternatives, notwithstanding multiple discovery requests to which SPX 138163–64 would have been responsive. For the reasons set forth below, the motion to strike will be granted as to this document and the information contained therein.

On August 12, 2014, BAC submitted its first set of requests for production, (Mot. Strike Documents, Ex. 11, Pl.'s First Set of Requests for Production, ECF No. 141-11), including a request for "[a]ll documents and things relating or referring to any efforts to design around the '782 patent." *Id.* at 9 (Request for Production No. 25). Additionally, several months before the close of fact discovery,[31] BAC served Interrogatory No. 18: "Describe any steps or efforts you

---

[31] "Several months" is an undisputed characterization provided by BAC's counsel. (Mot. Strike Documents 4, ECF No. 141). Neither party has identified an exhibit establishing the transmittal date of this interrogatory; however, the court notes that BAC's eighth set of interrogatories, which begins with Interrogatory No. 19, was served on SPX on September 11, 2015. (Opp'n Mot. Strike Documents, Ex. 7, Eighth Set of Interrogatories, ECF No. 158-7). Thus, it is clear that Interrogatory No. 18 was served some time before September 11, 2015.

have taken to avoid infringing the Patents-in-Suit, including any design-around, work-around, modification, alteration, restriction on use, or redesign of the Accused Instrumentalities, and identify any documents referring or relating to [the] same." (Mot. Strike Documents, Ex. 14, Def.'s First Supplemental Response to Interrog. No. 18 at 3, ECF No. 141-14).

SPX did not provide information on its proposed design around alternatives in response to BAC's first request for production.  As for Interrogatory No. 18, SPX initially responded that it was "investigating whether it could implement design changes that would further distinguish its products from the asserted '782 patent, particularly as the '782 patent was recently construed by the Court."  *Id.* at 5.  On October 12, 2015, it supplemented this response by referring BAC to its first supplemental response to Interrogatory No. 4.  *Id.*  The first supplemental response to Interrogatory No. 4 provided, in relevant part, that "SPX is currently investigating potential means to further distinguish its product from the BAC models, including the placement of fill below the intermediate basin."  (Opp'n Mot. Strike Documents, Ex. 14, Def.'s Second Suppl. Resp. to Interrogs. 4 & 6 at 7, ECF No. 158-14).

It was not until October 15, 2015, that SPX turned over SPX 138163–64, which was purportedly created on that date.  The next day, SPX acknowledged this document in a Second Supplemental Response to Interrogatory No. 4, describing it as providing "potential alternative designs to the MH Fluid Cooler that would further distinguish it from BAC's '782 patent." *Id.*

SPX first argues that SPX 138163–64 was turned over prior to the end of fact discovery, and therefore it was timely disclosed in compliance with Rule 26.[32]  Along the same lines, they

---

[32] SPX also contends that its disclosure was timely because it was provided before the end of expert discovery.  This argument is unpersuasive.  The proposed design-around alternatives were created by a fact witness and were properly subject to document production and interrogatory requests during the fact discovery period.

argue that SPX worked diligently to establish and disclose its design-around alternatives after receiving the court's *Markman* order on August 28, 2015.  (Memorandum and Order, ECF Nos. 113, 114).  Neither argument is compelling.  Simply turning over a document at the end of fact discovery does not make it timely for the purposes of Rule 26.  "The rule prohibits parties who are aware of their deficient response from 'hold[ing] back material items and disclos[ing] them at the last moment.'" *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1282 (Fed. Cir. 2012) (quoting 8A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2049.1 (3d ed. 2011)).  Here, SPX failed to provide its design-around alternatives until *after* the deposition of Eldon Mockry, the very person who created SPX 138163–64.

Further, the timing of the court's *Markman* order does not excuse SPX's delay.  SPX was aware of the very real possibility that the court would adopt BAC's claim construction positions in its *Markman* order; it cannot reasonably claim to have been surprised by this outcome.  SPX has provided no explanation as to why they could not have created SPX 138163–64 prior to Mr. Mockry's deposition, which was in any event taken over five weeks after the *Markman* order was issued.  For disclosure of this information to have been timely, it should have been disclosed prior to Mr. Mockry's deposition or, at the very least, early enough in the fact discovery period that BAC could reasonably seek a second deposition to cover the newly disclosed information.  SPX waited until the very end of fact discovery, after all fact depositions were concluded, to reveal the basis of its design around alternatives.  SPX did not timely supplement its interrogatory responses in violation of Rule 26.

The court next looks to whether this failure was substantially justified or harmless.  *See* Fed. R. Civ. P. 37(c)(1).  SPX claims BAC suffered no real harm because BAC's expert, Mr. Welch, had ample time to review the proposed design-around alternatives, and SPX's expert, Mr.

Wright, opined on the alternatives and was cross-examined regarding the same.  Notwithstanding

the experts' discussion of the alternatives, SPX's untimely disclosure was neither substantially

justified nor harmless as evidenced by a review of the *Southern State* factors.  The surprise to

BAC here is obvious: SPX took over a year to produce design-around alternatives from when

they were first requested, and it did so on the final day of fact discovery, weeks after the witness

who prepared the alternatives had been deposed.  The only method of curing BAC's surprise—

reopening fact discovery so that BAC may depose Mr. Mockry and possibly other persons

involved in the creation of the design-around alternatives—would further delay litigation at

significant expense to both parties.[33]  SPX's justification for delay—that it waited until after the

court issued its *Markman* order—does not excuse withholding this information until after all fact

depositions had been conducted.  SPX should have been aware that waiting until the very last

day of fact discovery to turn over SPX 138163–64 would preclude significant investigation by

BAC.  Finally, while the importance of the design-around alternatives in evaluating damages

weighs against exclusion, importance alone is not enough in light of BAC's significant prejudice.

BAC was deprived of the opportunity to investigate the technical or commercial merits of the

proposed design-around alternatives.  Accordingly, the court will strike SPX 138163-64 and

preclude SPX's reliance on the same.  Any portion of Mr. Wright or Ms. Schenk's expert report

that addresses the design-around alternatives also will be excluded.

---

[33] Without the ability to conduct further fact discovery, BAC's only means of obtaining information on
the design-around alternatives was through its deposition of SPX's technical expert, Mr. Wright.
Unfortunately, Mr. Wright did not possess the information necessary for BAC to evaluate the technical or
commercial merits of the proposed design-around alternatives.  Mr. Wright admitted in his deposition
that, while he discusses the design-around alternatives in his expert report, he only "reviewed them in a
cursory manner."  (Reply Mot. Strike Documents, Ex. F, Wright. Dep. 273:10-273:21, ECF No. 171-6).
He was not involved in creating the design-around alternatives, and was only able to offer generalized
conclusions as to whether they would have infringed the '782 patent.

### b.  SPX 138470: Cost Estimates and Timelines

BAC also seeks to strike the document bates labeled SPX 138470, which provides cost estimates and implementation timelines for the design-around alternatives.  This request is moot because the court has excluded SPX 138163-64 and any opinion based thereon.  SPX will not be able to offer testimony on design-around alternatives; accordingly, it follows that they may not introduce evidence as to the costs of or implementation timelines for the design-around alternatives.

### c.  SPX 138149 & SPX 38152: SPX's Other Products

BAC seeks to strike SPX 138149 and SPX 138152, which pertain to products offered by SPX that it now claims are non-infringing alternatives.  Although these documents were produced before the end of fact discovery, BAC contends they were not timely disclosed because SPX delayed production until after all relevant depositions were conducted.  Even if these documents were untimely under Rule 26, a Rule 37 exclusion sanction is not warranted in this instance as any delay is harmless.

SPX produced SPX 138149 and SPX 138152 in response to Interrogatory No. 19, issued on September 11, 2015, which requested "the complete legal and factual basis for Your contention, if any, that there exist or existed any alternatives to the Marley MH Fluid Cooler that do not or did not infringe any of the Asserted Claims of the '782 Patent including, for each such alleged alternative, the date(s) when it was available, the source(s) from which it was available, and why it does not or did not infringe any of the Asserted Claims of the '782 Patent."  (Opp'n Mot. Strike Documents, Ex. 7, Pl.'s Eighth Set of Interrogatories 8, ECF No. 158-7).  BAC argues that the documents also would have been responsive to Interrogatory No. 10, issued in September of 2014, which requested the basis for SPX's contention that BAC is not entitled to

lost profits, including "the entire basis for contesting . . . the absence of acceptable noninfringing substitutes." (Mot. Strike Documents, Ex. 20, Def.'s Suppl. Resp. Interrog. No. 10 at 3, ECF No. 141-20). In response to Interrogatory No. 10, SPX responded that "There were and still are numerous alternatives to the accused products that would not infringe the '782 patent, including without limitation other fluid coolers, but also other products such as hybrid coolers and cooling towers combined with plate and frame heat exchangers." *Id.*

While SPX 138149 and SPX 138152 conceivably could have been responsive to Interrogatory No. 10, as well as earlier requests for production, the documents did not exist at that time. They were created in response to Interrogatory No. 19 and as a supplement to the deposition testimony of Mr. Bougher, SPX's Rule 30(b)(6) designee. In any event, BAC cannot reasonably claim surprise at SPX's contention that it could sell its other products in lieu of the MH Fluid Cooler. SPX's broad response to Interrogatory No. 10 suggested any manner of alternative coolers would satisfy the customer's desire, and indeed BAC's counsel questioned Mr. Bougher extensively about other fluid coolers on the market, including other models sold by SPX. (Opp'n Mot. Strike Documents, Ex. 12, Bougher Dep. 76:5–78:17, 104:4–105:7, 207:2–12, ECF No. 158-12). This indicates both an awareness that these products were available and that SPX might rely on them in arguing the availability of noninfringing alternatives. BAC's decision to supplement Mr. Bougher's testimony does not warrant exclusion of those documents.

### d.   SPX 138469: Market Segment Addition to Revenue & Margin Spreadsheet

BAC also seeks to exclude the document bates labeled SPX 138469, which is an excel spreadsheet containing revenue and margin information for sales of the MH Fluid Cooler. This document was a timely supplement under Rule 26(e). SPX 138469 simply updated a spreadsheet, provided initially in SPX 117647–695 (and supplemented in SPX 138468), by adding a column specifying the pertinent market segment for each sale of the MH Fluid Cooler.

While this document conceivably could have been responsive to Interrogatory No. 10, BAC had yet to reveal how it was framing the market for the purposes of its lost profits contention at the time that interrogatory was served.  It was not until two weeks before the close of fact discovery that BAC affirmed it would seek lost profits "in proportion to BAC's share of the relevant market," (Opp'n Mot. Strike Documents, Ex. 22, Pl.'s Third Suppl. Response 12, ECF No. 158-22), and it was not until Mr. Herrington issued his expert report on November 12, 2015, that BAC revealed the relevant market as the "coil-fill segment" of the market.  (Opp'n Mot. Strike Documents, Ex. 21, Herrington Expert Report ¶¶ 28, 32, ECF No. 158-21).

If BAC wanted more information as to how SPX classified different divisions of the market, it should have specifically requested that information during fact discovery.  BAC has the burden of proving lost profits.  It is not reasonable to expect SPX to have divined the specific evidence needed to respond to BAC's lost profits argument *prior to* BAC disclosing the bases underlying that argument.[34]  This document was properly disclosed pursuant to Rule 26(e).

### e.  SPX 138471: Operating Margins

Finally, BAC seeks to exclude SPX 138471, a spreadsheet providing information regarding SPX's operating margins on sales of the MH Fluid Cooler.  This document was a timely supplement, pursuant to Rule 26(e), of information contained in SPX 133703, which was produced on September 18, 2015, during fact discovery.  SPX 138471 simply corrected a calculation error that was discovered by Ms. Schenk in preparing her report, and it will not be excluded.

---

[34] BAC further argues exclusion is proper because "Ms. Schenk does not cite to SPX 138469 to evaluate BAC's market share [in response to BAC's estimate] as SPX claims, but instead to evaluate BAC's marketing capability to exploit the demand for the MH Fluid Cooler."  (Reply Mot. Strike Documents 11, ECF No. 171).  Defining the relevant market is key to both evaluating market share and marketing capability, (*see, e.g.*, Herrington Expert Report ¶ 62, ECF No. 158-21); this argument does not weigh in favor of exclusion.

**VIII.   SPX's Motion to Strike Declarations of Kavita Vallabhaneni and Ryan Herrington**

SPX moves, pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure, to strike the declarations of Kavita Vallabhaneni and Ryan Herrington submitted in opposition to SPX's motion to exclude the testimony of Ryan Herrington and motion for summary judgment on the issue of lost profits.  For the reasons that follow, the motion to strike will be denied as to both Ms. Vallabhaneni's and Mr. Herrington's declarations.

**A.  Kavita Vallabhaneni**

SPX contends BAC violated Rule 26 when it failed to identify Kavita Vallabhaneni in its initial disclosure of potential witnesses.  They further contend that BAC violated Rule 26(e)(1) by not complying with its duty to supplement initial disclosures and interrogatory responses—specifically, BAC failed to mention Ms. Vallabhaneni in response to an interrogatory seeking all factual bases supporting BAC's contention of lost profits and the identification of all persons with knowledge of facts relevant to that determination.  Instead, they contend Ms. Vallabhaneni submitted a declaration providing an estimate of Evapco's market share for the first time in opposition to SPX's motions.  They seek exclusion of her declaration and market share opinion pursuant to Rule 37(c)(1).

During deposition testimony taken at least two weeks prior to the close of fact discovery, Timothy Buzby, BAC's corporate representative and Rule 30(b)(6) designee on the topic of market share, specifically mentioned Ms. Vallabhaneni as someone he spoke with regarding "some of the support for the market share assumptions."  (Mot. Strike Declarations, Ex. 15, Buzby Dep. 14:11–16:12, ECF No. 184-16). Ms. Vallabhaneni was disclosed as one of three individuals Mr. Buzby spoke with in preparation for his deposition, and she was the only one identified as providing support for his market share testimony.

SPX contends Mr. Buzby's testimony was insufficient to constitute a supplementation under Rule 26(e) because it did not specifically identify Ms. Vallabhaneni as a potential witness. This interpretation of the Federal Rules' disclosure requirements is unduly restrictive and not supported by the plain language of Rule 26.  The rule does not require parties to specify which witnesses will ultimately be called at trial.  Along these same lines, and notwithstanding SPX's citation to district court cases from other circuits, no binding precedent requires supplementary disclosures under Rule 26(e) to include explicit statements that a person will be a witness at trial.

Mr. Buzby's testimony put SPX on notice that Ms. Vallabhaneni may be used to support BAC's market share claims.  This disclosure is sufficient under Rule 26(e)(1)(A) to satisfy BAC's duty to supplement both its initial disclosures and its response to SPX's interrogatory. Accordingly, SPX's motion to strike Ms. Vallabhaneni's declarations will be denied.

**B.  Ryan Herrington**

SPX also challenges declarations provided by Ryan Herrington, BAC's damages expert, by pointing to three issues on which Mr. Herrington allegedly provided new opinions or information not disclosed as required under Rule 26(a) or Rule 26(e).  Specifically, they challenge those portions of his *Daubert* and Lost Profits declarations regarding (1) lost profits, (2) reasonable royalty, and (3) the SPX customer defendants.  They seek to strike these portions pursuant to Rule 37.  For the reasons that follow, SPX's motion to strike Mr. Herrington's declarations will be denied.

**a.  Lost Profit Opinions**

SPX points to twelve paragraphs contained in the Herrington *Daubert* and Lost Profits Declarations that allegedly contain new and previously undisclosed opinions regarding lost profits.  These opinions were previously and adequately disclosed pursuant to Rule 26.

Paragraphs 20, 21, and 22 of the Herrington Daubert Declaration and Paragraph 24 of the Herrington Lost Profits Declaration[35] have ample support in either Mr. Herrington's expert reports or his deposition testimony supplementing those reports.  The paragraphs offer no new opinions.  Paragraph 20 pertains to the Evapco market share and Mr. Herrington's conversations with Mr. Lowman—a matter on which he already opined and was deposed.  (*See* Mot. Strike Declarations, Ex. 6, Herrington Expert Report ¶ 56, ECF No. 184-7; Ex. 10, Herrington Dep. 164:20–166:22, ECF No. 184-11).  A portion of paragraph 21 states language nearly identical to paragraph 56 of Mr. Herrington's expert report, and both paragraphs 21 and 22 are otherwise consistent with his prior deposition testimony about comparing the Evapco market share estimate with other evidence in the record.  (*See* Herrington Expert Report ¶ 56, ECF No. 184-7; Herrington Dep. 126:20–128:2, 138:9–143:11, ECF No. 184-11).  Paragraph 24 of his Lost Profits Declaration simply stated that he considered the deposition testimony of Douglas Bougher and Timothy Buzby in rendering his opinions.  This information was both disclosed as part of the information Mr. Herrington considered in forming his expert report and reiterated during his deposition testimony.  (*See* Herrington Expert Report at Ex. 2, ECF No. 184-7; Herrington Dep. 115:19–116:4, 194:19–195:2, ECF No. 184-11).  SPX identifies only insignificant semantic differences between the statements in Mr. Herrington's declarations and the opinions offered in his expert report and deposition testimony.  These minor discrepancies do not rise to the level of a Rule 26 violation.  Accordingly, SPX's motion to strike these paragraphs will be denied.

Further, paragraphs 23–30 of the Herrington *Daubert* Declaration do not violate Rule 26.  These paragraphs identify six documents that Mr. Herrington reviewed to confirm his Evapco

---

[35] SPX withdrew its challenge to paragraph 41 of the Herrington Lost Profits Declaration.

market share estimate.[36]  These documents were listed in the "information considered" portion of

Mr. Herrington's expert report.  (Herrington Expert Report at Ex. 2, ECF No. 184-7).  SPX

claims Mr. Herrington may not simply rely on the "information considered" exhibit, pointing to

cases from other circuits where courts have found that an expert citing generally to voluminous

material has not revealed the basis of his opinion as required by Rule 26.[37]  This case is different.

Mr. Herrington's initial expert report revealed a specific basis for his market share estimate:

conversations with Greg Lowman, BAC's Vice President of Global Engineering (who, in turn,

had access to BAC's marketing department and their trove of knowledge regarding the cooler

market).  (Herrington Expert Report at Ex. 5, ECF No. 184-7).  He put SPX on notice at his

deposition that he relied on additional documents to confirm this estimate, (Herrington Dep.

126:20–129:19, ECF No. 184-11), and then subsequently identified those documents (which had

already been listed in the information considered section of his report) via a separate declaration.

SPX cannot claim prejudicial surprise from such timely disclosed material.  Accordingly, SPX's

motion will be denied as to these paragraphs and documents.

### b.  Reasonable Royalty Opinions

SPX also contends Mr. Herrington offered a new opinion regarding a reasonable royalty

through paragraph 42 of the Herrington Daubert Declaration, which states: "The MH Fluid

Cooler has experienced gross margin percentages of 20.4% to 46.4% from July 2007 through

September 2015.  When negotiating a reasonable royalty as part of the hypothetical negotiation,

SPX would consider the associated gross margin of the MH Fluid Cooler."  (Mot. Exclude

Herrington, Herrington Daubert Declaration, ECF No. 155-1).  This is not a "new opinion" for

---

[36] Specifically, Mr. Herrington identifies the documents bates labeled BAC_047725, BAC_047723, BAC_045012, SPX 000016, SPX 000392, and SPX 081711.  A copy of each is attached to his Daubert declaration.

[37] *See, e.g.*, *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 738 (7th Cir. 1998); *Reed v. Binder*, 165 F.R.D. 424, 430 (D.N.J. 1996).

the purposes of Rules 26 and 37.  Mr. Herrington referenced SPX's gross margins in his initial

expert report and addressed SPX's consideration of those margins in his rebuttal report.

(Herrington Expert Report ¶¶ 34, 101–02, ECF No. 184-7; Mot. Strike Declarations, Ex. 8,

Herrington Rebuttal Report ¶¶ 62-64, ECF No. 184-9).  Accordingly, SPX's motion will be

denied as to this paragraph.  In any event, Mr. Herrington will not be permitted to offer an

opinion on a reasonable royalty for the reasons discussed below in the court's analysis of SPX's

*Daubert* motion.

### c.   Customer Defendants Opinion

SPX's claim that Mr. Herrington provided a new opinion regarding the SPX customer

defendants in paragraphs 46 and 47 of the Herrington Daubert Declaration is similarly without

merit.  These paragraphs repeat the opinions offered in Mr. Herrington's expert report and

deposition testimony.  (Herrington Expert Report ¶ 20 n.17, ECF No. 184-7; Herrington Dep.

200:4–203:19, ECF No. 184-11).  SPX's motion will be denied.  In any event, Mr. Herrington

will not be allowed to offer an opinion on lost profits attributable to the customer defendants for

the reasons discussed below in the court's analysis of SPX's *Daubert* motion.

### IX.   BAC's Motion to Exclude Opinions of Kimberly J. Schenk

BAC seeks to strike portions of the expert report of Kimberly J. Schenk, SPX's damages

expert, regarding a reasonable royalty.  Specifically, BAC challenges her reliance on (1) a

settlement agreement between BAC and Evapco ("the Evapco settlement agreement"), (2)

proposed design around alternatives, and (3) allegedly undisclosed operating margins.  (Mot.

Exclude Schenk, ECF No. 143).  Because Ms. Schenk may not rely on the Evapco settlement

agreement or the proposed design-around alternatives, the court will exclude her reasonable

royalty opinion in its entirety.

### A.  Legal Standard Governing an Expert's Reasonable Royalty Opinion

Damages in patent infringement cases are governed by 35 U.S.C. § 284, which provides in relevant part that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."  A reasonable royalty may be estimated using the framework of a hypothetical negotiation (with validity and infringement assumed) between the patentee and the infringer, occurring prior to the date of alleged infringement.  "A comprehensive (but unprioritized and often overlapping) list of relevant factors for a reasonable royalty calculation appears in *Georgia–Pacific Corp. v. United States Plywood Corp.,* 318 F. Supp. 1116, 1120 (S.D.N.Y.1970)."  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868–69 (Fed. Cir. 2010) (internal citation omitted).[38]

---

[38] Those factors are: "1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.  2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.  3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.  4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.  5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.  6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.  7. The duration of the patent and the term of the license.  8. The established profitability of the product made under the patent; its commercial success; and its current popularity.  9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.  10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.  11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.  12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.  13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.  14. The opinion testimony of qualified experts.  15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably

The Federal Circuit's embrace of the *Georgia–Pacific* factors reflects that an expert must rely on evidence "tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011). Typically, an expert begins by framing the hypothetical negotiations around a starting point that comes from *Georgia-Pacific* "factors 1 and 2—looking at royalties paid or received in licenses for the patent in suit or in comparable licenses—and factor 12—looking at the portion of profit that may be customarily allowed in the particular business for the use of the invention or similar inventions." *Id.* at 1317.[39] That is, the expert should not offer a starting point that is "arbitrary, unreliable, [or] irrelevant," *id.* at 1318, but rather one that is in some way related to the facts of the instant case.

## B. Ms. Schenk's Reliance on the Evapco Settlement Agreement

In conducting her reasonable royalty analysis, Ms. Schenk relies heavily on what she views as the most reliable license in the record: a license arising from a settlement agreement between BAC and Evapco, another competitor. For the reasons discussed below, Ms. Schenk may not rely on the Evapco settlement agreement.

Generally speaking, "[t]he propriety of using prior settlement agreements to prove the amount of a reasonable royalty is questionable." *LaserDynamics, Inc. v. Quanta Computer, Inc.*,

---

and voluntarily trying to reach an agreement. . . ." *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

[39] "Traditionally, the analysis began with a review of license agreements involving the parties (Factors 1 and 2), as well as publicly available royalty rates obtained from public filings and databases such as RoyaltyStat (Factor 12). This produced the requisite starting point with respect to the hypothetical negotiation. The starting point would then be subject to adjustment based on a review of the remaining twelve factors." Roy Weinstein et. al., *Taming Complex Intellectual Property Compensation Problems*, 22 Fed. Circuit B.J. 547, 552 (2013).

694 F.3d 51, 77 (Fed. Cir. 2012).  The terms and fees of a license arising from a settlement

agreement may be "tainted by the coercive environment of patent litigation," which contrasts

with the assumptions on which the hypothetical negotiation framework are based, namely the

assumption of "a voluntary agreement . . . between a willing licensor and a willing licensee, with

validity and infringement of the patent not being disputed." *Id.*  Nonetheless, in "certain limited

circumstances," relying on a settlement agreement to establish a reasonable royalty may be

appropriate. *Id.*  Even in these instances, such as where the settlement agreement is "the most

reliable license in [the] record," the court must nonetheless "consider the license in its proper

context." *Id.*  While questions about the comparability of a license to the parties' hypothetical

negotiations are typically factual and reserved for the jury, *see ActiveVideo Networks, Inc. v.

Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012), there is nonetheless a minimum

relevance threshold that must be satisfied for an expert's reliance on such licenses to survive a

*Daubert* motion.  *Id.*  For a settlement agreement to meet this minimum threshold of relevance,

the expert must provide *some* analysis on the litigation underlying the agreement.  Without this

analysis, the factfinder cannot accurately assess comparability.

Ms. Schenk has not provided sufficient information that would allow the court, and in

turn the jury, to compare the Evapco settlement agreement license to the specific facts of this

case.  Beyond acknowledging the actual terms of the settlement agreement, Ms. Schenk offers no

detail as to the litigation posture of BAC and Evapco at the time of settlement.  No amount of

cross-examination can cure this defect, as Ms. Schenk's report does not provide any information

on the parties' positions in regards to claim construction, validity, or infringement, and she did

not supplement this information during her deposition.  (Mot. Exclude Schenk, Ex. E, Schenk

Expert Report ¶¶ 93–101, 120, ECF No. 143-7; Ex. F, Schenk Dep. 235:18–254:2, ECF No. 143-

8).  Without this information, the factfinder cannot assess to what degree the settlement

agreement license was "tainted by the coercive environment of patent litigation." *Laser*

*Dynamics*, 694 F.3d at 77; *see also AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1335 (Fed.

Cir. 2015) (upholding reliance on settlement agreement where settlement agreement related to

the same product as litigation in question and "[t]he district court analyzed the pertinent

settlement and licensing negotiations in detail and with close attention to the similarities and

differences between those negotiations and the hypothetical negotiation in this case"); *AVM*

*Techs., LLC v. Intel Corp.*, 927 F. Supp. 2d 139, 144 (D. Del. 2013) ("[A] single settlement

agreement on a different patent without any analysis of the settlement context is not a reliable

method for calculating damages."). [40]

Ms. Schenk's calculation of a running royalty rate arising from the Evapco settlement

agreement also raises significant reliability issues.  She describes how she calculated an "implied

royalty rate" for the Evapco license:

> I am unaware of any information about the amount of sales Evapco has made under the
> license. I have calculated an implied royalty rate for this agreement based on SPX's sales,
> assuming that SPX paid a similar $500,000 lump sum for the rights to the '782 patent at
> the time of the hypothetical negotiation; this would equate to a royalty rate of
> approximately 1.14% based on projected MHF sales through the life of the '782 patent.
> Although a license to the '685 patent is not perfectly comparable to the hypothetically
> negotiated license to the '782 patent, it nonetheless provides a useful indicator of the

---

[40] BAC also points out that the Evapco settlement agreement does not involve the '782 patent.  The
Federal Circuit has not addressed the question of whether a single settlement agreement on comparable
technology can support a royalty opinion, and district courts have provided mixed decisions on the point.
*Compare AVM Techs., LLC v. Intel Corp.*, 927 F. Supp. 2d 139, 145 (D. Del. 2013) (expressing doubt
that "a single settlement agreement on a comparable technology could be the basis for a reliable [royalty
rate] conclusion") *with Open Text S.A. v. Box, Inc.*, Civil No. 13-04910-JD, 2015 WL 393858, at *5 (N.D.
Cal. Jan. 29, 2015) (addressing a *Daubert* challenge to the use of settlement agreements, including ones
dealing with patents other than the patent-in-suit, and finding that because the licenses arising from the
agreement were the most reliable licenses in the record, any challenges were best reserved for cross-
examination).  As Ms. Schenk's reliance on the Evapco settlement agreement is excluded on other
grounds, the court need not resolve this issue.

amount that was actually paid for a license with a number of similarities to the hypothetically negotiated license.

(Opp'n Mot. Exclude Schenk, Ex. 1, Schenk Expert Report ¶ 101, ECF No. 160-1). Putting aside questions about the reliability of lump sum agreements in calculating running royalty rates,[41] this opinion nonetheless fails to clear the threshold of reliability required by *Daubert*. Ms. Schenk provides no justification—besides lacking information on Evapco's sales—for using SPX's projected sales in her calculation; nor does she explain why this is a reliable methodology. Simply put, this opinion offers mere speculation masquerading as quantitative analysis. For all of the reasons discussed above, the portions of Ms. Schenk's expert report pertaining to the Evapco settlement agreement will be excluded pursuant to *Daubert* and Rule 702.[42]

### C.  Ms. Schenk's Reliance on Design Around Alternatives

As discussed above, the court will strike SPX 138163-64, which lays out SPX's four proposed design-around alternatives for the MH Fluid Cooler.  The portions of Ms. Schenk's report that rely on the design-around alternatives will not be considered, and she may not offer testimony on these alternatives.

---

[41] "[C]ertain fundamental differences exist between lump-sum agreements and running-royalty agreements. . . . [T]o use a running-royalty agreement as a basis to award lump-sum damages, however, some basis for comparison must exist in the evidence . . . ." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1330 (Fed. Cir. 2009).

[42] To the extent that SPX argues Ms. Schenk's opinion should be permitted because the Evapco license is the "most reliable" license in the record, the court also rejects that argument.  While some courts have interpreted *ResQNet* as providing that "settlement agreements are permissible as comparable licenses if they are the most reliable licenses on the record," *Intelligent Verification Sys., LLC v. Microsoft Corp.*, No. 2:12-CV-525, 2015 WL 1518099, at *3 (E.D. Va. Mar. 31, 2015), the court is unconvinced that the Federal Circuit intended to erode the trial court's gate-keeper role under *Daubert*.  Thus, even if the court were to accept that the Evapco settlement agreement were the only agreement in the record, it does not automatically follow that the agreement is admissible.  *ResQNet* did not lessen the reliability and relevance standards to be applied when assessing these agreements.  If all of the licenses in the record are unreliable, it cannot follow that the least unreliable license must be admitted.

### D.  Ms. Schenk's Reliance on Operating Margins

BAC's arguments regarding Ms. Schenk's opinion on SPX's operating margins are repetitive of those rejected by the court in ruling on BAC's motion to strike late produced documents (specifically the portion regarding SPX 138471).  For the same reasons, BAC's motion will be denied as to Ms. Schenk's opinion and testimony regarding operating margins.

### E.  Ms. Schenk May Not Offer a Reasonable Royalty Opinion

Having stricken the portions of her opinion that rely on the Evapco settlement agreement and SPX's proposed design-around alternatives, Ms. Schenk's opinion supporting a 2% reasonable royalty now lacks sufficient factual support to meet *Daubert*'s reliability threshold. The only quantitative evidence remaining—SPX's operating margins on sales of the MH Fluid Cooler—is insufficient to support a 2% royalty.  Ms. Schenk's reliance on operating margins to offer an opinion on reasonable royalty is tied to the design-around alternatives that were excluded pursuant to Rule 37.  In particular, Ms. Schenk notes when discussing the operating margins of the MH Fluid Cooler that "the best indicator of the portion of the profit on the MHF that is attributed to the '782 patent can be measured by the increase in the per-unit costs associated with implementing a design-around alternative." (Schenk Expert Report ¶ 105, 123, ECF No. 160-1).  The operating margins alone are insufficiently connected to the reasonable royalty rate offered in her opinion.  Accordingly, the entirety of Ms. Schenk's reasonable royalty opinion will be excluded, and she may not offer testimony on this issue.

Those portions of Ms. Schenk's opinions not affected by this ruling may still be considered, and she may testify as to those topics, including BAC's purported lost profits.  She may not rely on any stricken material, including the proposed design-around alternatives, in offering that testimony.

**X.      SPX's Motion to Exclude Opinions of Ryan Herrington**

SPX moves to exclude certain portions of the opinions and testimony of Ryan

Herrington, BAC's damages' expert.  Namely, they seek to exclude his opinions on lost profits, a

reasonable royalty, and lost profits attributable to the customer defendants.  For the reasons that

follow, SPX's motion will be granted in part and denied in part.

**A.  Mr. Herrington's Lost Profits Opinion**

SPX contends Mr. Herrington's market share calculations, on which his lost profits

opinion relies, are not based on sound economic and factual predicates as required by *Daubert*

and Rule 702.  Namely, they argue that his estimate of Evapco's market share (approximately

10% higher than SPX in any given year) is impermissibly supported by a single conversation

with Greg Lowman, BAC's Vice President of Global Engineering.  While Mr. Herrington only

cited this conversation in the exhibit of his original report providing his market share estimate,

(Mot. Exclude Herrington, Ex. 1, Herrington Expert Report at Ex. 5, ECF No. 136-2), he also

testified that his conclusions were drawn from specific documents provided by both BAC and

SPX during discovery. (Mot. Exclude Herrington, Ex. 3, Herrington Dep. 126:20–129:19, ECF

No. 136-4).  These documents, which are cited in the "list of information considered" portion of

his report, (Herrington Expert Report at Ex. 2, ECF No. 136-2), provide a sufficient foundation

for Mr. Herrington's opinion regarding Evapco's market share.  That the documents were

included in the list of information considered rather than a footnote below the market share

estimate does not suggest the opinion is unreliable, and SPX has not pointed to any authority that

would support such a proposition.  SPX's challenge to the accuracy of Mr. Herrington's

conclusions is appropriately addressed through cross-examination.

### B.  Mr. Herrington's Reasonable Royalty Opinion

SPX further challenges Mr. Herrington's calculation of a reasonable royalty rate.

Namely, it contends his opinion is inadmissible because it considers the *Georgia-Pacific* factors

without regard to a starting point—that is, a starting royalty rate which varies up or down based

on the expert's application of the *Georgia-Pacific* factors.  In response, BAC argues that Mr.

Herrington permissibly relied on quantitative data points in applying the *Georgia-Pacific* factors

and that the facts of this case do not support a single starting point.  For the reasons that follow,

the court rejects BAC's position and will exclude Mr. Herrington's reasonable royalty opinion

pursuant to *Daubert* and Rule 702.

Without a relevant starting point, a *Georgia-Pacific* analysis is not a reliable

methodology.  *See Open Text S.A. v. Box, Inc.*, Civil No. 13-04910-JD, 2015 WL 349197, at *6

(N.D. Cal. Jan. 23, 2015) ("[V]arying upwards and downwards without any starting point at

all—even an arbitrary one—is impermissible.").  The facts of the instant case bear this out.

Rather than identifying a starting royalty rate,[43] Mr. Herrington contends there are no

comparable licenses in the record on which to base his *Georgia-Pacific* analysis. (Herrington

Expert Report ¶¶ 74–76, ECF No. 136-2).  Instead, he opines that BAC would not accept less

than a 27.6% royalty, which is derived from his lost profits estimate, and SPX would not accept a

royalty rate higher than 36.5%, the average of its gross profit margins on the MH Fluid Cooler.

Mr. Herrington's report then reviews each *Georgia-Pacific* factor, stating whether each would

drive the royalty rate (or, in some instances, the parties' relative bargaining power) up or down.

He concludes with his "conservative" estimate of a 29% royalty.  The fundamental flaw in this

analysis becomes clear when one tries to identify exactly what Mr. Herrington was pushing up or

---

[43] Mr. Herrington admits that his opinion does not begin with an objective starting point.  (Herrington Dep. 239:10–240:5, 266:9–267:4, ECF No. 136-4).

down based on each *Georgia-Pacific* factor.  Without some identifiable and relevant rate to which these factors are applied, the factfinder is unable to evaluate *how* the expert reaches his final number.  This *ipse dixit* justification is the hallmark of an unreliable methodology.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion.").

Further, even assuming *arguendo* that a *Georgia-Pacific* analysis is methodologically sound when relying on a range of acceptable royalties rather than a single starting point, Mr. Herrington's opinion is still inadmissible.  Namely, the "quantitative data" on which he relies—specifically, BAC's 27.6% royalty position derived from its lost profits estimate—is not "tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time."  *Uniloc*, 632 F.3d at 1317.  This is because Mr. Herrington's lost profits calculation is inextricably intertwined with information gained as a result of SPX's alleged infringement—e.g. sales of the accused product, market share after the release of the accused product, and market and customer reactions to the patented technology.  (Herrington Expert Report ¶ 30, ECF No. 136-2).  This information would not have been available to BAC at the time of a hypothetical negotiation scenario in which SPX had yet to begin infringing the '782 patent.  It follows that the lost profits rate is not indicative of the position BAC would take at the beginning of the hypothetical negotiations.  In contrast, it is plausible that BAC would seek to recover, through a

reasonable royalty, those profits BAC would forego in licensing to SPX in this hypothetical

scenario—that is, profits BAC would earn if it were to keep its monopoly on the '782 patent and

SPX were to never sell technology practicing the '782 patent.  In contrast to Mr. Herrington's

lost profits estimate, this information is tied to "the relevant facts and circumstances of the

particular case at issue and the hypothetical negotiations that would have taken place in light of

those facts and circumstances *at the relevant time*." *Uniloc*, 632 F.3d at 1317 (emphasis added).

Accordingly, for this reason also, Mr. Herrington's reasonable royalty opinion must be excluded

under *Daubert* and Rule 702.  The portions of Mr. Herrington's report opining on a reasonable

royalty will be stricken, and he will not be allowed to offer testimony on this point at trial.

### C.  Mr. Herrington's Lost Profits Opinion: Customer Defendants

SPX seeks to exclude Mr. Herrington from offering an opinion regarding damages

associated with the SPX customer defendants because his report provided no specific lost profits

or reasonable royalty opinions as to Eagle Mountain or Sanderson Farms.  His report references

damages attributable to the customer defendants in a single footnote: "I have been informed by

counsel, to the extent SPX is not found liable for infringement, Eagle Mountain International

Church and Sanderson Farms, Inc. would be liable to BAC for at least BAC's lost profits related

to SPX's infringing sales made to Eagle Mountain International Church and Sanderson Farms,

Inc., respectively." (Herrington Expert Report ¶20 n.17, ECF No. 136-2).   BAC contends there

is sufficient support in Mr. Herrington's report for him to offer an opinion on the lost profits

damages associated with the sale of a single MH Fluid Cooler to each customer defendant.  His

report provides "the incremental margin that would be associated with BAC's sale of a single

FXV unit for each year in the damages period" and "[t]hat number represents the amount of lost

profits damages associated with a single sale of an MH Fluid Cooler."  (Opp'n Mot. Exclude

Herrington 36–37, ECF No. 155).

BAC's attempts to rescue Mr. Herrington's opinions regarding the customer defendants

are too little too late.  Mr. Herrington's report provides no estimate of the damages attributable to

each sale, and BAC simply cites the average incremental margin per FXV unit per year.  His

report offers no analysis that considers the specifics of the MH Fluid Cooler units purchased by

the customer defendants.  While a sale-by-sale analysis may not be necessary when providing a

broader lost profits opinion, an expert's opinion on damages arising from two individual sales

cannot be reliable if it is not based on facts specific to those sales.  The average incremental

margin associated with BAC's sale of a single FXV unit is simply an insufficient basis for a

reliable opinion on this matter.  For this reason, Mr. Herrington's opinions on damages

attributable to the customer defendants will be excluded pursuant to *Daubert* and Rule 702.

## XI.    SPX's Motion for Summary Judgment: Laches, Willful Infringement, Lost Profits

Finally, SPX has moved for partial summary judgment on the issue of laches, no willful

infringement, and no lost profits.  SPX withdrew its request for summary judgment on the issue

of no willful infringement as a result of the Supreme Court's recent decision in *Halo Electronics,*

*Inc. v Pulse Electronics, Inc*., 136 S. Ct. 1923 (2016).  Accordingly, the court will not address

that issue on summary judgment.  For the reasons that follow, SPX's motion will be denied as to

the issues of laches and no lost profits.

### A.  Laches

#### a.  Background

SPX made its first sales of the MH Fluid Cooler in 2005.  (Mot. Part. Summ. J. Laches,

Ex. 5, MH Fluid Cooler Sales Data, ECF No. 138-7).  That same year, promotional information

on the MH Fluid Cooler was available on Marley's public website and the MH Fluid Cooler was publicly showcased at the February 2005 International Air-Conditioning, Heating, Refrigerating Exposition ("AHR Expo").  (Mot. Part. Summ. J., Ex. 8, BAC News Flash Dated April 25, 2005, ECF No. 138-10).

Internal documents show that BAC was aware of the MH Fluid Cooler by early 2005.  Its marketing department issued two "news flashes" in January and April of 2005 to North American Department Heads, Executive, Marketing, Customer Service, and International Managing Directors.  These newsflashes described in some detail the various features of the MH Fluid Cooler and noted that one was on display at the 2005 AHR Expo.  (Mot. Part. Summ. J. Laches, Ex. 7, BAC News Flash Dated January 18, 2005, ECF No. 138-9; Ex. 8, BAC News Flash Dated April 25, 2005, ECF No. 138-10).  A November 2005 News Flash updated this information, noting that the MH Fluid Cooler "utilizes . . . plastic 'Thermal Equalizer' trays above the mid-level gravity flow basin of the MH in an attempt to thermally equalize the spray water and help prevent debris from clogging the secondary nozzle system.  Marley was forced to adopt this maintenance unfriendly design due to BAC patents protecting the combined flow technology used on the FXV and CXV product lines."  (Mot. Part. Summ. J. Laches, Ex. 13, BAC News Flash Dated November 16, 2005, ECF No. 138-15).  The plastic "Thermal Equalizer" tray was subsequently removed from the MH Fluid Cooler in late 2005, including all coolers then on the market.  (Mot. Part. Summ. J. Laches, Ex. 17, SPX Engineering Change Order 6983, ECF No. 138-19; Ex. 18, SPX Engineering Specification 12542.2 at SPX 005088, ECF No. 138-20).

The '782 patent issued on September 19, 2006.  BAC provides an affidavit from Mr. Lowman stating that "shortly after the '782 patent issued," BAC "became aware that SPX had

redesigned its Marley MH Fluid Cooler," including removal of the thermal equalizer tray. (Opp'n Mot. Part. Summ. J. Laches, Ex. 3, Lowman Decl. ¶ 19, ECF No. 167-70).  Documentary evidence shows that BAC was aware of this fact by at least March 25, 2008.  (Mot. Part. Summ. J., Ex. 16, BAC Resource Library Document: Sales Information at BAC_047483, ECF No. 138-18).  That same evidence reveals, however, that BAC was unsure of the full extent of the revisions being made by SPX.  *See id.* (noting that "[i]t *seems* Marley has begun to drop the Thermal Equalizer Trays in their MH" (emphasis added)).

Mr. Lowman also avers that BAC understood SPX to be continually revising its products after 2006.  He notes that BAC made efforts in 2007 to locate and inspect a MH Fluid Cooler, though the company was ultimately unable to inspect a model until Mr. Lowman had an opportunity to visually inspect the inside configuration at a January 2013 trade show.  (Lowman Decl. ¶ 22–25, ECF No. 167-70).   Shortly after that trade show, Mr. Lowman contacted counsel and BAC initiated the present suit.  *Id.*   ¶¶ 13-15.

### b.  Legal Standard

Laches is an equitable defense to a patent infringement claim; it precludes the patentee from recovering damages occurring prior to initiation of the instant suit.[44]  *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992) (en banc).  The issue is one within the discretion of the district court.  *Id.*  To successfully assert a laches defense, a defendant must prove two elements by a preponderance of the evidence:

> 1. the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and

---

[44] In some unusual instances, the court may exercise its discretion and preclude an ongoing royalty award. *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 807 F.3d 1311, 1331–33 (Fed. Cir. 2015), *cert. granted,* 136 S. Ct. 1824 (2016).

2. the delay operated to the prejudice or injury of the defendant.

*Id.* at 1032, 1045.  "The length of time which may be deemed unreasonable has no fixed

boundaries but rather depends on the circumstances.  The period of delay is measured from the

time the plaintiff knew or reasonably should have known of the defendant's alleged infringing

activities to the date of suit. However, the period does not begin prior to issuance of the patent."

*Id.* at 1032 (citations omitted). "[P]rejudice may be either economic or evidentiary.  Evidentiary,

or "defense" prejudice, may arise by reason of a defendant's inability to present a full and fair

defense on the merits due to the loss of records, the death of a witness, or the unreliability of

memories of long past events, thereby undermining the court's ability to judge the facts.

Economic prejudice may arise where a defendant and possibly others will suffer the loss of

monetary investments or incur damages which likely would have been prevented by earlier suit."

*Id.* at 1033 (citations omitted).  Additionally, "[a] patentee may also defeat a laches defense if the

infringer has engaged in particularly egregious conduct which would change the equities

significantly in plaintiff's favor." *Aukerman*, 960 F.2d at 1033 (internal quotation marks and

citation omitted).

A presumption of laches arises if the patentee delays bringing suit for more than six years

after attaining actual or constructive knowledge[45] of the defendant's infringement.  *Id.* at 1034–

35; *Wanless v. Fedders Corp.*, 145 F.3d 1461, 1463–64 (Fed. Cir. 1998).  Once the defendant

establishes a six year delay, the burden of production shifts[46] to the patentee to come "forward

---

[45] Constructive knowledge is that which the patentee "might have obtained upon inquiry, provided the facts already known by [the patentee] were such as to put upon a man of ordinary intelligence the duty of inquiry." *Wanless v. Gen. Elec. Co.*, 148 F.3d 1334, 1338 (Fed. Cir. 1998) (quoting *Johnston v. Standard Mining Co.,* 148 U.S. 360, 370 (1893)).

[46] The burden of persuasion, however, remains with the defendant.  *Aukerman*, 960 F.2d at 1038–39.

with either affirmative evidence of a lack of prejudice or a legally cognizable excuse for its delay

in filing suit." *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553–54 (Fed. Cir. 1996).

At the summary judgment stage, a court should not apply this presumption when the

summary judgment record reflects "genuine disputes on material issues as to whether [the

patentee] knew or reasonably should have known of [the defendant's] allegedly infringing

activity" six or more years prior to filing suit. *Fedders Corp.*, 145 F.3d at 1464.  That is, SPX is

entitled to the presumption at the summary judgment stage only if the court determines that "no

fact finder could reasonably conclude that [BAC] did not know, or should not have known, of

[SPX's infringing] activities for six or more years before filing suit." *Hall*, 93 F.3d at 1552–53.

If the presumption does not apply, SPX may only obtain summary judgment if no genuine

dispute of fact exists regarding the two elements of the laches defense.

### c.  Analysis

A genuine dispute precludes application of the presumption of laches and, in turn,

summary judgment on the issue of laches.  A fact finder could reasonably determine on the basis

of the summary judgment record that BAC did not have ongoing actual or constructive

knowledge of SPX's alleged infringement prior to 2013.

SPX offers multiple arguments as to why laches are appropriate.  They contend that the

presumption of laches should apply here because BAC studied the MH Fluid Cooler as early as

2005, conducted a detailed analysis of its internal components, and had access to an SPX

marketing document that BAC later used as evidence of infringement.  As SPX sees it, BAC's

possession of these materials reveals early knowledge of infringement or, at the very least, the

materials triggered a duty to investigate.  *See Fedders Corp.*, 145 F.3d at 1466 ("[The patentee]

did have a duty to investigate a particular product if and when publicly available information

about it should have led [the patentee] to suspect that product of infringing."); *see also Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1338 (Fed. Cir. 1998) ("For example, sales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities, give rise to a duty to investigate whether there is infringement.").  SPX's version of the facts is, however, contested.

BAC concedes that while it tracked development of the MH Fluid Cooler and had access to SPX's marketing documents, it did not know or suspect SPX's alleged infringement because it believed SPX (1) removed the "thermal equalizer tray" before the issuance of the '782 patent and (2) conducted a redesign sometime thereafter.  Viewing the evidence in the light most favorable to BAC, a fact finder could reasonably conclude that BAC did not know of, and had no reason to suspect, infringement after SPX removed a feature (accessible only upon an internal inspection) that practiced a key claim limitation from the '782 patent as part of its ongoing redesign efforts. *Cf. Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1350 (Fed. Cir. 2009) ("In the case of a claim limitation whose presence is undetectable in a finished product, it is reasonable that [the patentee] might not have known or been able to find out whether [the defendant] infringed.").  While a patentee is responsible for policing its patent rights, it does not follow as a matter of law that a patentee has a continuing duty to investigate a competitor's product notwithstanding its belief that the competitor removed a key infringing component, particularly where such investigation would be at great expense to the patentee.  *Cf. Fedders Corp.*, 145 F.3d at 1464–65 ("Imposing a duty upon Wanlass to monitor the air-conditioning industry by periodically testing all others' products, therefore, would be unreasonable.").  Thus,

because there is a genuine dispute over when BAC knew or should have known of infringement, the court cannot yet apply the presumption of laches.

With the presumption defeated, the court looks to whether the delay itself was unreasonable.  Disputed facts here also preclude a finding on summary judgment.  Most importantly, genuine disputes of fact exist (as laid out above) regarding exactly *when* BAC knew or should have known of SPX's alleged infringement.  To rule for SPX would require determining witness credibility and drawing inferences against BAC.  The court cannot make such determinations at the summary judgment stage.  *Fedders Corp.*, 145 F.3d at 1467 (citing Fed. R. Civ. P. 56(c)).  SPX's motion for partial summary judgment on the issue of laches must be denied.[47]

## B.  Lost Profits

SPX's motion for partial summary judgment on the issue of lost profits is premised entirely on its motion to exclude Mr. Herrington's lost profits opinion.  For the reasons discussed above, that motion will be denied.  Accordingly, SPX's motion for partial summary judgment on the issue of lost profits must also be denied.

In accordance with the opinions stated above, the court will issue an order, which follows, resolving the pending motions.


___8/22/16_____                         _____/S/_____
Date                                          Catherine C. Blake
                                              United States District Judge

---

[47] *See, e.g.*, *Fedders Corp.*, 145 F.3d at 1467–68 ("The district court, therefore, erred in granting summary judgment to [the defendant] on this record because genuinely conflicting evidence about whether [the patentee] knew or reasonably should have known of Fedders's allegedly infringing activity precluded resolution of the issue on summary judgment. After further development of the evidence and/or an evidentiary hearing, however, the district court may be able to properly determine what Wanlass knew or reasonably should have known about Fedders's allegedly infringing activities more than six years prior to filing suit . . . .")